**GLOBAL VAN LINES, INC.**

v.

**The UNITED STATES.**

Nos. 259–65, 355–65.

United States Court of Claims.
March 17, 1972.

Davis, J., filed an opinion dissenting in part, and Nichols, J., filed an opinion dissenting in part.

Alan F. Wohlstetter, Washington, D. C., atty. of record, for plaintiff; Ernest H. Land, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE and DURFEE, Senior Judges, and DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DURFEE, Senior Judge.*

These cases, which were tried jointly, arose out of the transportation by plaintiff, under Government bills of lading issued by the Department of Defense, of household goods belonging to military personnel. The shipments moved between points in the United States and points overseas.

Beginning in 1965, several hundred cases, involving many thousands of claims based on separate shipments, have been filed in this court by carriers of military household goods. Some of the litigating carriers are members of the Household Goods Forwarders Association of America, Inc. and others are members of the Household Goods Carriers' Bureau. After extensive negotiations, representatives of the carriers and representatives of the Government selected one case as presenting all of the issues that are involved in all of the cases filed by members of the Household Goods Forwarders Association of America, Inc.; and they selected two cases as together presenting all of the issues that are involved in all of the cases filed by members of the Household Goods Carriers' Bureau. It was agreed by the parties, with the approval of the commissioner, that only the test cases thus selected would be tried; that the court's decisions on the issues of liability in such cases would constitute the bases for the disposition of all the pending cases.

The test case selected for members of the Household Goods Forwarders Association of America Inc. was Trans Ocean Van Service v. United States, No. 137–66 ("*TOVS*"). That case was decided by this court on May 15, 1970 (426 F.2d 329, 192 Ct.Cl. 75).

The two cases now under consideration, Nos. 259–65 and 355–65, both filed by Global Van Lines Inc. ("plaintiff"), were the test cases selected for members of the Household Goods Carriers' Bureau ("the Bureau"). It was agreed by the parties, with the approval of the commissioner, that a joint trial would be held in cases Nos. 259–65 and 355–65, and that the trial would be limited to the issues bearing on plaintiff's right to recover on its claims, or bearing on defendant's right to recover on its counterclaims, with the amount of any such recovery being reserved for determination in subsequent proceedings under Rule 131(c).

Plaintiff is a Texas Corporation that maintains its principal place of business in Anaheim, California. At all times material to this litigation, plaintiff held itself out to the Department of Defense as ready, willing and able to transport the household goods of military personnel for compensation between points in the United States and points overseas. The principal types of service offered by plaintiff were (1) door-to-door-container service, (2) door-to-door-container-Government (MSTS) service, otherwise known as Mode 5, and (3) motor-van-sea-van service.

Door-to-door container service involves the pre-packing and loading of each shipment into specially designed carrier-owned containers at the origin residence, transporting the loaded containers to the port of debarkation, arranging for the movement overseas by ship or by air, transporting the loaded containers from the point of debarkation to the destination residence, and unloading the household goods from the containers and placing them into the owner's new residence.

Door-to-door-container-Government (MSTS) service, or Mode 5, is identical with the door-to-door-container service except that ocean transportation between military ocean terminals is provided by ships owned by, or under charter to, defendant's Military Sea Transportation Service ("MSTS").

In the motor-van-sea-van service, uncrated household goods are placed into a moving van at the origin residence and

---

* The court acknowledges the assistance it has received from the Report of Trial Commissioner Mastin G. White. We have adopted his opinion and findings of fact on most of the issues presented in this case.

are transported in the van to the port of embarkation, where the household goods are placed in sea-van containers, and loaded on a ship. At the port of debarkation, the household goods are removed from the sea-van containers, and the uncrated shipment is then placed in a moving van and transported in the van to the owner's new residence at the destination point.

The shipments transported in the door-to-door container service and in Mode 5 move under indivisible single-factor rates applicable from origin to destination. Some of the shipments transported in the motor-van-sea-van service also move under single-factor rates, while other shipments in this mode move under multiple-factor rates, *i.e.*, separate rates for different segments of the land and water transportation performed by the carrier.[1]

The issues presented in cases Nos. 259–65 and 355–65 by the pleadings, the pretrial proceedings, and the evidence at the trial will be dealt with in the succeeding parts of this opinion.

*I. Alleged Diversion to New Point Without SIT (Storage-in-Transit)*

■ One issue involved in the present litigation is whether there was a "diversion" of a shipment, entitling plaintiff to compensation in addition to the line-haul transportation charge when the shipment was consigned to the property owner at a specified military base at a specified city, and plaintiff was later advised by defendant, upon the arrival of the shipment at the designated base and city, and before any storage-in-transit ("SIT") was accomplished, that the owner's new residence was located off the base, and that the shipment should be delivered to the owner at the off-base address. Shipments 3920 and 6940 were selected by the parties as illustrating this issue.

Shipment 3920 involved a situation where plaintiff was ordered by defendant to effect delivery to the property owner at a residential address located *in the same city* as the military base to which the shipment was consigned. A similar situation was considered by the court in *TOVS*, 426 F.2d at 342–344, 192 Ct.Cl. at 101–104; and the court held that no diversion of the shipment was involved because of change from original delivery instructions. After the court's decision in *TOVS* was announced, plaintiff in the present litigation informed the commissioner that it was withdrawing its diversion claim based on shipment 3920.

However, *TOVS* did not present for consideration any claim involving a delivery to the property owner at a residential address in a city different than the city containing the military base to which the shipment was consigned. Shipment 6940 in the present litigation involves such a claim.

Shipment 6940 originated in Japan and was consigned to the property owner at Maxwell Air Force Base, Montgomery, Alabama. Storage-in-transit was authorized, and plaintiff was instructed in the Government bill of lading to notify the transportation officer at Maxwell Air Force Base upon the arrival of the shipment and prior to placing it in SIT. Upon the arrival of the shipment at the designated City of Montgomery, Alabama, plaintiff notified the transportation officer at Maxwell Air Force Base, and was instructed to deliver the shipment to the property owner's new residence, 709 Stonewall Drive, Prattville, Alabama, which plaintiff did. The distance between Montgomery and Prattville is approximately ten miles.

Plaintiff has already been paid for the transportation of shipment 6940 from Japan to Montgomery, Alabama. In the present litigation, plaintiff is suing for an additional amount of $40.73, based upon the alleged diversion of shipment 6940 from Maxwell Air Force Base,

---

1. Findings 7 and 8 specify the tariffs and tenders in effect prior to March 1, 1963, and thereafter under the adoption of the Uniform Military Basic Tender (MBT).

The shipments mentioned in parts III–XVII of the findings moved prior to March 1, 1963; those mentioned in parts XVIII–XXIII moved after this date.

Montgomery, Alabama to Prattville, Alabama.

As stated in Bureau tariffs and regulations, specified in our findings of fact, the term "diversion" means, for the purposes of the present litigation: (1) a change in the name of the consignor; (2) a change in the name of the consignee; (3) a change in the destination; (4) a change in the route, when requested by the consignor, consignee, or owner of the shipment; or (5) other instructions to the carrier that require a change in billing or an additional movement of the car or truck, or both.[2]

It was part of plaintiff's responsibility, in return for the transportation charge paid by defendant, to pack and "containerize" the household goods at the origin residence, to transport the containers to the destination residence, and to remove the household goods from the containers and place them in the destination residence. At the time when the property owner was transferred from Japan to Maxwell Air Force Base, and his household goods were tendered to and accepted by plaintiff for transportation, it was not known by the property owner, by defendant, or by plaintiff just where the property owner would be residing after he began his new duty assignment at Maxwell Air Force Base at Montgomery, Alabama. The property owner might be assigned Government-owned quarters on the base, or it might be necessary for him to obtain housing elsewhere. Consequently, plaintiff was instructed in the Government bill of lading to notify the transportation officer at Maxwell Air Force Base upon the arrival of the shipment at Montgomery, so that the transportation officer could give plaintiff specific delivery instructions (or else direct plaintiff to place the shipment temporarily in SIT until delivery instructions could be issued).

When the instructions of defendant's transportation officer were given to plaintiff, changing the specified place of delivery, the shipment had arrived in Montgomery before it had been released from the custody of the carrier. If the carrier had been then directed by the transportation officer to deliver to the Maxwell Air Force Base or to another address in Montgomery, Alabama, this would not have been a diversion; there would have been no change in the destination or the original delivery instructions. Trans Ocean Van Service v. United States, *supra*. ("*TOVS*"). In *TOVS* the shipment in question was consigned to the property owner at Beeville, Texas (NAAS) (Naval Air Auxiliary Station). Upon arrival of the shipment in Beeville, the carrier was instructed to deliver the shipment to the property owner at 173 Ann Burke Apartments in the same City of Beeville. We held in *TOVS* that this was not a diversion.

The trial commissioner's opinion correctly points out that plaintiff's diversion claim for diversion of shipment 3920 involved a situation where plaintiff was ordered to effect delivery at a residential address *located in the same city* as the military base to which the shipment was consigned, and because of our decision

---

2. Rule 28 of the Bureau's Tariff No. 84–B and of the Bureau's Tariff 94–B provided in pertinent part as follows:

"(a) Upon instructions made or confirmed in writing by the consignor, consignee, or owner, a shipment will be diverted subject to the following provisions and additional charges:

"(b) The term diversion as used herein means:

"(1) A change in the name of the consignor.

"(2) A change in the name of the consignee.

"(3) A change in the destination.

"(4) A change in the route at the request of the consignor, consignee or owner.

"(5) Any other instructions given which are necessary to effect delivery and requiring an addition to or a change in billing, or an additional movement of the shipments or both.

"(c) When an order for diversion under this rule is received by a carrier, diligent effort will be made to locate the shipment and effect the change desired, but the carrier will not be responsible for failure to effect the change ordered, unless such failure is due to the error or negligence of the carrier or its employees."

in *TOVS*, plaintiff withdrew its claim for 3920.

The commissioner's distinction between the claims for diversion without storage-in-transit in *TOVS*, and plaintiff's claim here on shipment 6940 is clear. Our decision in *TOVS* does not support defendant's position that there was not a change in destination under the tariff or in original delivery instructions in the present case.

In contending that there can be no diversion until a first delivery has been made under the single-factor rate, defendant cites Routed Thru-Pac, Inc. v. United States, 401 F.2d 789, 185 Ct.Cl. 428 (1968), where the court said:

> It is undisputed in shipments not involving SIT that plaintiff is obliged in consideration for the single-factor rate to "pick-up" goods at the origin residence and "deliver" these goods to the destination residence. In other words, the single-factor rate necessarily includes one "pick-up" and one "delivery" and all the land and water transportation in between. * * * (*Routed Thru-Pac, supra,* 401 F.2d at 793, 185 Ct.Cl. at 435).

The court stated:

> The issue here is whether *both* the movement into and the movement out of storage-in-transit are accessorial or additional services subject to additional compensation under Item 145, *i.e.,* in excess of the compensation of the single-factor rate, or whether one of the movements relating to SIT (*e.g.,* movement into SIT when SIT *occurs at destination*) is already included within the single-factor rate. [Emphasis supplied]. (*Routed Thru-Pac, supra,* 401 F.2d at 792, 185 Ct.Cl. at 432–433).

The court decided that the movement into SIT at destination was included in the single-factor rate.

The question now before us does not involve the issue as stated in *Routed Thru-Pac, supra,* which involved movements into the SIT warehouse selected by plaintiff to serve the destination set forth on the GBL. The claim then under consideration in *Routed Thru-Pac* was not for a "diversion" of the shipment under the applicable tariffs.

Defendant first argues that since the single-factor rate covers a delivery at the destination of Montgomery, Alabama, and since no delivery was made at Montgomery under the single-factor rate, and no change was made which affected the manner in which the shipment was handled, plaintiff is not entitled to diversion for the movement from Montgomery to Prattville. Defendant's theory would require a delivery at the original destination specified in the GBL, and then a "change in the manner" in which the shipment was handled by the delivery of the shipment to the newly specified residential address, before there could be a diversion of the shipment. Under this theory, the transportation officer could have notified plaintiff upon arrival and before delivery of the shipment in Montgomery, Alabama, that the property owner's new residential address was in Seattle, Washington instead of Prattville, Alabama, without any resulting "diversion" of the shipment because there was no delivery at Montgomery under the single-factor rate, and no change in the manner in which the shipment was handled since there was merely a change in address of the property owner.

However, the definitions of "diversion" in the tariff and regulations do not specifically include or require a change in the manner in which the shipment was handled. Defendant does qualify its argument and limits the obligation of plaintiff to deliver to the new residential address to the extent adopted in the language of the trial commissioner's opinion.

In his opinion, the commissioner first distinguished the present claim on shipment 6940 from the claim for diversion without SIT in *TOVS:* "However, *TOVS* did not present for consideration any claim involving a delivery to the property owner *at a suburban residential address* outside the boundaries of the city con-

taining the military base to which the shipment was consigned. Shipment 6940 in the present litigation involves such a claim." [Emphasis supplied.]

There is no finding of fact and no evidence in the record before us to support this conclusion as to "a suburban residential address". Prattville is an incorporated city with a population of 13,116 people, according to the official U. S. Census Report for 1970. A suburban residential area is generally defined as "the residential area on the outskirts of any city or large town; an outlying part of a city or town; a smaller place adjacent to or sometimes within commuting distance of a city." Webster's Third New International Dictionary at 2281 (1967). "A usually residential area or community outlying a city: [t]he perimeter of country around a major city; environs." The American Heritage Dictionary of the English Language at 1284 (1969). The trial commissioner's conclusion that 709 Stonewall Drive, Prattville, Alabama was a "suburban residential address" outside the boundaries of Montgomery, Alabama, is unsupported, either by evidence or by common definition.

From this unsupported premise, the trial commissioner concluded:

It is reasonable to infer that plaintiff understood, when it received shipment 6940 for transportation, that delivery instructions might involve a delivery to government-owned quarters at Maxwell Air Force Base or to some other residential address *located within normal commuting distance* for personnel working at Maxwell Air Base. Certainly, Prattville, Alabama, being located a distance of only about 10 miles from Maxwell Air Force Base, must be regarded as being within *normal commuting distance of the base.* [Emphasis added.]

Again, there is no finding of fact or evidence in the record before us as to what "must be regarded as being within normal commuting distance of the base." "Commute" is defined as "travel back and forth regularly or frequently (commuting between London and New York)". Webster's, *supra* at 461. A "commuter" is defined as "one that commutes (as between suburban home and city work)." Webster's, *supra* at 461, or "[a] person who travels regularly between his home in one community and his work in another." American Heritage Dictionary, *supra* at 270. Obviously, any exercise in semantics offers no definitive answer as to the distance or area that we must regard as being "within normal commuting distance of the base," and there is an equal lack of any definitive answer in the findings of fact or the record as to any common understanding or practice in the industry on this point.

No expert testimony was adduced to support the theory that the transportation officer could direct delivery of shipment 6940 from GBL destination of Montgomery to Prattville because Prattville was within "normal commuting distance" of Montgomery.

On the contrary, defendant's witness McNeill, Assistant to the Director of the Transportation Division, General Accounting Office, who testified as an expert for defendant on other issues, did testify that whether a carrier is entitled to diversion compensation is governed by the carriers' tariff provisions, and that a delivery to a different address than that specified on the GBL would be a diversion. This expert opinion was corroborated by another Government witness Shinn, Supervisor of the Personal Property Branch, McGuire Air Force Base, New Jersey, who added that any "local area" or "free" delivery radius in which shipments could be diverted without any additional charge for the diversion would be set out in the carriers' tariff.

Furthermore, we note that when an extended delivery radius, such as a "normal commuting distance" from the GBL destination, was contemplated by the parties, they specifically provided for such

a radius in the tariff. Section II of MRT 15, provided:

> * * * when storage-in-transit shipments are diverted to storage in government facilities at destination, carrier will perform delivery and unpacking service *within a 30 mile radius of the point of storage* without additional charge. * * * [Emphasis supplied.]

The rates applicable to shipment 6940 (Sec. III of MRT 15) applied from *points* in Japan to specific *points* within specific zones or cities within the United States. Both Montgomery and Prattville, Alabama are stated as separate destination points. This means that any orders for transportation (as evidenced by the GBL) from origin to any point within a given destination zone would be charged for at the same rate per mile, provided the shipment is not diverted from the destination stated on the GBL. It does not mean that defendant's transportation officer could subsequently order a shipment moved between common-rated points within a given destination zone (Montgomery and Prattville in Zone 10) without incurring additional charges determined by the tariffs and regulations.

We can find no ambiguity in the identical definitions of diversion stated by plaintiff in the tariff, and by defendant in its regulation, *supra.* As so defined, a diversion occurs when there is " * * * (3) a change in the destination." The term "destination" is clearly defined by defendant's regulations in DSAR 4500, which require that, in completing the GBL, the transportation officer fills in the blank section for "destination" of the shipment by inserting therein the "City, state/country" selected by him. Under defendant's regulations, "destination" is a specific city in a specific state or country; in this case, "Montgomery, Alabama."

Defendant contends that plaintiff's failure to bill the Government for the diversions which it now claims are clear indications of plaintiff's contemporary interpretation of the contracts. The trial commissioner disposed of defendant's "billing argument" in his discussion of the estoppel issue as follows:

> It is true that most of the claims on which plaintiff is now suing were not involved in the initial bills which plaintiff submitted to defendant in connection with the respective shipments, and which defendant paid upon presentation. Subsequently, after plaintiff had engaged the services of two auditing firms to go over its accounts with the Department of Defense for the transportation of military household goods, plaintiff presented to the Department of Defense supplemental bills asking for charges which were not included in the original bills, or asking for additional amounts in connection with charges previously made. In this connection, however, if plaintiff initially failed to bill defendant for—and defendant failed to pay plaintiff—the correct amount that was due for transporting a particular shipment of military household goods, there would seem to be no sound basis for permitting defendant, on the ground of estoppel, to withhold the proper amount from plaintiff. Defendant has not suffered a detriment, but, on the contrary, has had the continued use of funds which plaintiff was entitled to receive several years ago.

We can see no basis for concluding that the methods of original billing are to be considered as indicating a contemporaneous interpretation of the contracts so as to be binding in the interpretation of the contracts, particularly when the original bills were later corrected by audit and supplemental bills submitted.

There is nothing else in the record to indicate any use or practice of the industry as in billing practices contrary to plaintiff's claim for diversion of shipment 6940. We later consider herein the practice followed in an alleged diversion to Non-Temporary Storage. Shipment 4430 was destined by the GBL to the Brooklyn Army Terminal, Brooklyn, New York. The shipment was not delivered to the Brooklyn Army Terminal, but was reconsigned to the property owner, and

placed in non-temporary storage in a warehouse of another carrier in Jersey City, New Jersey, six miles distant,[3] by order of the transportation officer. Defendant has conceded that there was a diversion of this shipment, and admitted liability therefor. However, defendant argues here that Claim 4430 involved a reconsignment to the property owner, and a new delivery made to a new destination. The regulations already cited point out that there is no practical distinction between a "reconsignment" and a "diversion." The only material difference in the facts as to the two shipments is that on Claim 4430, the transportation officer, under the same circumstances, ordered a change in GBL destination to a different city six miles away from the GBL destination, whereas in Claim 6940 the City of Prattville, Alabama was ten miles away from the GBL destination in the City of Montgomery.

The fact that plaintiff was instructed in the GBL to notify the transportation officer at Maxwell Air Force Base upon arrival of the shipment in Montgomery of a change so that the transportation officer could give plaintiff specific delivery instructions, or else direct placement in storage-in-transit until delivery instructions could be issued, does not alter the operation of defendant's regulation. These instructions had two purposes: first, to allow inspection and policing by the officer of carrier's shipment performance to the destination specified. This purpose is unrelated to the question as to whether or not a shipment is diverted. The second purpose of notifying the transportation officer prior to placing the shipment in storage was for him to order the shipment placed in storage-in-transit prior to delivery to residence in the destination city specified on the GBL, or to divert the shipment to a different destination city.

That the "destination" of a shipment is restricted to a specific city or point is corroborated by the language of the applicable diversion provision in MRT 15 which provides that diversion compensation is computed from the specific destination "point" to which a shipment is originally consigned and *not from a commuting radius area*. Section II of MRT 15 provides as follows:

Rates to Apply When Shipments are Diverted or *Destination Point* is Consigned or Reconsigned After Commencement of Transportation Service

\*　　\*　　\*　　\*　　\*　　\*

3. When a shipment is reconsigned or diverted while enroute to the *point of original consignment,* the single factor rate will apply to the point at which the shipment is actually intercepted, and the diversion or reconsignment rate in Paragraph 4 will apply from the point of interception to the new destination point. [Emphasis supplied].

In contrast, the record shows that when a "free" delivery radius was to apply, plaintiff's tariff specifically provided for such a radius. Thus, Section II of MRT 15 provided a 30-mile free delivery radius for shipments which were ordered placed in storage in a Government, instead of a commercial warehouse, as we have already stated.

Certainly, plaintiff must have known that it could not completely discharge its contract obligation until the household goods had been delivered to and placed in the owner's residence, as instructed, wherever it was. However, this requirement does not determine the rate for the performance of the contract, or whether there was a diversion of the shipment; this is determined solely by the tariffs and regulations.

If we were to conclude now that a destination city encompasses a "normal commuting area" and that this area includes another city ten miles distant, we would still have to define a "normal commuting area" with more definite certainty in order to apply it as a decisive factor in the many other similar claims for diversion.

3. This mileage is taken from the Household Goods Carriers' Bureau Mileage Guide incorporated by reference in the governing rate tenders.

As already stated, there is nothing in the record before us as to establish, by common practice or definition, the extent of a "normal commuting area." The extent of the "commuting area" in each case would depend upon the wishes and habits of third persons, e.g., the property owners, who are not parties to the transportation contract, and their willingness to commute would undoubtedly vary from base to base and from time to time at the same base, depending upon imponderables for which there may not be a determinable norm for distance—for example, the use of country roads as contrasted to expressways in order to commute.

The record here does not support the assumption that Sergeant Moore, the owner of shipment 6940 would necessarily be commuting to Maxwell Air Force Base; he may have been retiring in Prattville, or he may have stayed at the base and commuted to Prattville on weekends. Upon arrival in Montgomery, the serviceman might not be assigned to the base designated in the GBL where the transportation officer is located. The transportation officer at Maxwell Air Force Base was responsible for shipments of household goods of military personnel moving to or from points in 13 counties in Alabama, including two other separate Air Force bases or stations— Gunter Air Force Base and Eufaula Air Station. By the time shipment 6940 reached Montgomery, Alabama, Sergeant Moore might have been assigned to the Eufaula Air Station, eighty miles from Prattville. In order then to deny a diversion, we would have to find that this was also a "normal commuting distance."

There are many other pending claims to be determined by our diversion ruling on shipment 6940 which will require consideration of many extraneous and imponderable factors in order to determine a "normal commuting distance" ; factors that could not have been ascertained or foreseen by these claimants or by the Government in the GBL direction of destination for the shipments. "Destination" is clearly and simply defined in defendant's own regulations as the "City,

state/country" specified in the GBL as the "destination". This is the definition of "destination" accepted by this court in *TOVS, supra*, in holding that an instruction to deliver the shipment to the property owner at a new address *"within the same city"* was not a diversion. It is the definition of "destination" used by the Government according to its own witnesses, and it is the definition conceded by the Government, and adopted by the commissioner and by the court for shipment 4430 in this case. Plaintiff's tariff and defendant's regulations provide a simple, unambiguous and certain standard for disposition of all of the pending claims for Diversion Without SIT which involve claims for "change of destination."

Accordingly, we find that the instruction of the transportation officer upon arrival of shipment 6940 at its specific destination point in the City of Montgomery, Alabama, to forward the shipment another ten miles to a new address in the City of Prattville, Alabama, ten miles distant, was a diversion of the shipment by a change in its destination within the meaning of the applicable tariffs and regulations.

*II. Alleged Diversion to SIT*

These cases initially involved the issue of whether there was a diversion when plaintiff was instructed by defendant to place a shipment temporarily in storage-in-transit at the destination point instead of making delivery to the destination address shown on the bill of lading (SIT being authorized by the bill of lading). Shipments 1100, 1240, 1520, 1820, and 5660 were selected by the parties as illustrating such issue.

This same issue was considered by the court in *TOVS*, and the court decided that instructions for the placement of a shipment in SIT under the circumstances outlined in the preceding paragraph did not constitute a diversion (426 F.2d at 338–341, 192 Ct.Cl. at 94–98). Subsequently, plaintiff in the present litigation notified the commissioner that it was withdrawing its claims based on

the alleged diversion of shipments 1100, 1240, 1520, 1820, and 5660 to SIT.

### III. Alleged Diversion to Non-Temporary Storage

Shipment 4430 in the present litigation involves the question of whether there was a diversion of a shipment when plaintiff was instructed by defendant, upon the arrival of the shipment at the destination city designated in the government bill of lading, to deliver the shipment to a warehouse for non-temporary storage (plaintiff having no connection with such warehouse).

Shipment 4430 originated in France and was consigned on the government bill of lading to the port transportation officer at the Brooklyn Army Terminal in Brooklyn, New York, but the GBL indicated that the owner was S/Sgt. Jerome E. Paul. Plaintiff was instructed in the bill of lading to notify the port transportation officer upon the arrival of the shipment in Brooklyn. Plaintiff did so, and the transportation officer directed that the shipment be placed in the Jersey City warehouse of Major Van Lines for non-temporary storage (plaintiff having no connection with that warehouse). This was confirmed through the issuance of a written "Notice of Diversion" by the transportation officer.

Plaintiff has been paid for the transportation of shipment 4430 from France to New York, and has also been paid a diversion mileage charge in the amount of $22.30 for the movement from the Brooklyn Army Terminal to the non-temporary storage warehouse in Jersey City.

In the present litigation, plaintiff's claim on shipment 4430 is for the flat $5 diversion charge provided for in Item 155 of the Bureau's Military Rate Tariff No. 4.

Defendant has conceded that there was a diversion of shipment 4430, and has admitted liability for the flat $5 diversion charge with respect to this shipment.

### IV. SIT Extension

When instituted, the present litigation involved a question as to whether there was a diversion in a situation where the government bill of lading covering a shipment authorized storage-in-transit at the destination for a period of "not to exceed 90 days," the shipment was placed in SIT at the destination point for 90 days, and the period of storage was then extended further by defendant upon the expiration of the 90-day period. This question was raised in connection with shipments 4800 and 6980.

The question outlined in the preceding paragraph was also involved in *TOVS;* and the court held that an extension of SIT beyond the period authorized in the bill of lading did not constitute a diversion (426 F.2d at 341, 192 Ct.Cl. at 98–100). Thereafter, plaintiff in the present litigation informed the commissioner that it was withdrawing its diversion claims based on shipments 4800 and 6980.

### V. Delivery From SIT

Shipments 1240, 5280, 5960, and 6820 were selected by the parties to illustrate plaintiff's claims based upon the alleged delivery of shipments from storage-in-transit.

However, with respect to shipments 5960 and 6820, it subsequently developed that plaintiff had already been paid the delivery charges to which plaintiff felt entitled. Accordingly, no additional compensation is now sought by plaintiff for the delivery of shipments 5960 and 6820 from SIT.

Shipment 5280 originated in England. It was consigned on the government bill of lading to the transportation officer at Luke Air Force Base, Arizona, but the bill of lading indicated that S/Sgt. Richard I. Whittaker was the property owner. The bill of lading authorized SIT at destination for a period of 90 days, and instructed plaintiff to notify the transportation officer at Luke Air Force Base prior to placing the shipment in SIT. Upon the arrival of the shipment at

Phoenix, Arizona, plaintiff notified the transportation officer and was instructed to place the shipment in SIT, which plaintiff did. Plaintiff was subsequently directed by defendant to remove the shipment from the SIT warehouse in Phoenix and deliver it to the property owner in Goodyear, Arizona. In this connection, plaintiff concedes in its reply brief that the distance traveled in effecting delivery from SIT was only about 12 miles.

Plaintiff has been paid charges for the transportation of shipment 5280 from England to Arizona, for the delivery of the shipment to storage in Phoenix, for the storage, and for the warehouse handling.

In the present litigation, plaintiff claims additional compensation in the amount of $109.20 for the delivery of shipment 5280 from SIT, based on the rate for this service prescribed in Section V of Supplement 15 to the Bureau's Military Rate Tariff No. 4 (plaintiff being a party to that tariff).

Shipment 5280 moved under the Bureau's Military Rate Tariff No. 19, to which plaintiff was a party. That tariff contained a provision which dealt with the subject of "Delivery to Storage-in-Transit" and which stated in part as follows:

1. All shipments consigned to storage-in-transit are subject to a charge, to deliver to storage-in-transit, of one dollar ($1.00) per net cwt.

Plaintiff's initial bill to defendant in connection with shipment 5280 included a charge in the amount of $55.85 for delivery to SIT, based upon the tariff provision quoted in the preceding paragraph. Defendant paid the charge of $55.85, as well as the other charges contained in plaintiff's bill. Plaintiff did not, in its initial bill, include any charge for the delivery of shipment 5280 from SIT.

Subsequently, plaintiff submitted a supplemental bill to defendant, setting out an additional charge of $109.20 for the delivery of shipment 5280 from SIT. Defendant refused to pay this additional charge, and it is involved in the present litigation.

Actually, the provision previously quoted from MRT No. 19, dealing with the delivery of shipments to SIT, was not applicable to shipment 5280. That provision related only to "shipments consigned to storage-in-transit," and shipment 5280 was not in that category. Instead, shipment 5280 was consigned to the transportation officer at Luke Air Force Base, Arizona.

Thus, plaintiff's charge in the amount of $55.85—which defendant paid—for the delivery of shipment 5280 to SIT was improperly assessed. The line-haul transportation charge on shipment 5280 covered one delivery of the shipment at the destination point, and this delivery was accomplished when the shipment was delivered to the SIT warehouse in Phoenix pursuant to defendant's instructions.

On the other hand, MRT No. 19 expressly stated that the transportation charge did not cover any "extra * * * delivery." In the case of shipment 5280, the movement of the shipment from the SIT warehouse in Phoenix over a distance of about 12 miles to the property owner in the nearby town of Goodyear was an "extra * * * delivery." Consequently, plaintiff was entitled to receive additional compensation for accomplishing the extra delivery of shipment 5280.

MRT No. 19 did not contain any provision expressly covering the delivery of shipments from storage-in-transit. However, MRT No. 19 did contain a note under the heading of "Rules, Regulations and Additional Services" which stated in part as follows:

NOTE: For service charges that are not included in the transportation rates (EXCEPT for service charges provided herein), refer to Military Rate Tariff ICC No. 4 * * *.

Since MRT No. 19 did not prescribe a service charge for the delivery of shipments from SIT, it is necessary, under the note just quoted, to refer to MRT

No. 4 in considering this particular service charge on shipment 5280.

Section V of Supplement 17 to Military Rate Tariff No. 4 prescribed "Pick-Up or Delivery Transportation Rates to Apply on Storage-in-Transit Shipments." With respect to deliveries from SIT effected in Arizona, where the movement was wholly within the same municipality or involved a distance not greater than 30 miles, the rates prescribed in Section V ranged from $1.50 to $3.40 per hundred pounds, depending upon the weight of a particular shipment. This is the provision that should be applied in calculating the amount of the service charge that was due plaintiff for effecting the delivery of shipment 5280 from the SIT warehouse in Phoenix to the property owner in Goodyear.

Plaintiff is entitled to recover the difference between the amount of the proper charge for the delivery of shipment 5280 from SIT and the amount of the improper charge previously collected by plaintiff for the delivery of this shipment to SIT.

Shipment 1240 originated in Germany and was consigned on the government bill of lading to the transportation officer at the Army Terminal Command in Brooklyn, New York. Storage-in-transit was authorized; and plaintiff was instructed to get in touch with the transportation officer upon the arrival of the shipment in Brooklyn. Plaintiff did so, and was directed to place the shipment in storage-in-transit. The SIT was accomplished in the Hoboken, New Jersey, warehouse of plaintiff's agent. Plaintiff was subsequently ordered by defendant to remove the shipment from SIT and deliver it to the property owner in Fort Sill, Oklahoma, and plaintiff did so.

In connection with the movement of shipment 1240 from the SIT warehouse in Hoboken, New Jersey, to the property owner in Fort Sill, Oklahoma, plaintiff has been paid a mileage charge in accordance with the provisions of Military Rate Tariff No. 19 dealing with the subject of diversions.[4] In the present litigation, plaintiff contends that its compensation for this movement should have been calculated in accordance with the delivery transportation rates applicable to storage-in-transit shipments, under the portion of Military Rate Tariff No. 4 previously discussed in connection with shipment 5280; and, therefore, that plaintiff is due the additional amount of $243.47 on the movement of shipment 1240 from the SIT warehouse in Hoboken, New Jersey, to the property owner in Fort Sill, Oklahoma.

It has been previously noted that the provision of MRT No. 4 prescribing rates for the delivery of shipments from SIT was incorporated by reference in MRT No. 19 by virtue of a note in MRT No. 19 stating that for "service charges" (other than those provided for in MRT No. 19 itself) reference should be made to MRT No. 4. With respect to the movement of shipment 1240 from the SIT warehouse in Hoboken, New Jersey, to the property owner in Fort Sill, Oklahoma, this was not a mere "extra * * delivery" of the shipment for which a "service charge" was appropriate. Rather, what was involved in this instance was a diversion—i. e., a change in the destination—of shipment 1240. Consequently, defendant did not err in computing plaintiff's compensation for the movement of shipment 1240 from Hoboken, New Jersey, to Fort Sill, Oklahoma, on the basis of the diversion mileage rates prescribed in MRT No. 19.

It necessarily follows that plaintiff's present claim based on the contention that the movement of shipment 1240 from Hoboken, New Jersey, to Fort Sill, Oklahoma, was a delivery from SIT, and thus was compensable under Section V of Supplement 17 to MRT No. 4, cannot be sustained, and the petition should be dismissed as to such claim.

---

4. Defendant says that plaintiff was also entitled to—but did not—collect the customary flat $5 diversion fee in connection with the movement of shipment 1240 from Hoboken to Fort Sill.

## VI. Additional Transportation Allegedly Performed as a Result of Maritime Strikes

The parties selected shipments 3160, 5820, and 1340 as being illustrative of plaintiff's claims based upon additional transportation allegedly performed as a result of maritime strikes that occurred in October and December of 1962.

On October 1, 1962, there was a strike by approximately 50,000 longshoremen in the Atlantic and Gulf ports of the United States, from Maine to Texas. The longshoremen returned to work on October 8, 1962, pursuant to a Taft-Hartley Act injunction issued by the United States District Court for the Southern District of New York. On December 23, 1962, the longshoremen went on strike again; and this strike lasted until the latter part of January 1963. The East Coast and Gulf Coast ports were closed while the strikes were in progress.

Because of the maritime strikes and their effect on overseas movements of military household goods (other than those moving in Mode 5), defendant notified plaintiff and other carriers of military household goods that if they wished to do so on a voluntary basis, they could turn shipments of military household goods over to the Military Sea Transportation Service ("MSTS") at military ocean terminals in origin countries for transportation aboard MSTS vessels to military ocean terminals in destination countries. Any carrier wishing to avail itself of this opportunity had to agree to reduce its customary transportation charges in order to take into account the port handling and the ocean transportation provided by MSTS.

Shipment 3160 was tendered to plaintiff for movement in the door-to-door container mode from Amarillo Air Force Base in Texas to the property owner at Torrejon Air Base in Spain. Plaintiff transported the shipment to New Orleans, Louisiana. Because of the December 1962 maritime strike, plaintiff voluntarily turned the shipment over to the MSTS at the Army Transportation Terminal in New Orleans for transportation to Spain. Shipment 3160 was loaded aboard an MSTS vessel in New Orleans on or about December 20, 1962; it was subsequently discharged at the MSTS ocean terminal in Cadiz, Spain; and it was then transported by plaintiff to the property owner at Torrejon Air Base.

Plaintiff has been paid for the transportation of shipment 3160 from Amarillo Air Force Base in Texas to Torrejon Air Base in Spain.

Cadiz, where shipment 3160 was unloaded from the MSTS vessel, is located 443 miles from Torrejon Air Base, the ultimate destination of the shipment. The commercial port of debarkation nearest to Torrejon Air Base is Barcelona, which is located 377 miles from Torrejon Air Base. In this connection, the evidence in the record indicates that plaintiff probably would have used Barcelona as the port of debarkation for shipment 3160 if the maritime strike had not occurred and the ocean transportation had been accomplished via a commercial ship.

In the present litigation, plaintiff asserts a claim for additional compensation in the amount of $39 on a *quantum meruit* basis because shipment 3160 was discharged by the MSTS vessel at Cadiz. This charge is computed by using, as the measure of compensation, the overseas transportation rate prescribed in Section VII of Supplement 17 to Military Rate Tariff No. 4 for shipments moving within Spain, and applying such rate to a distance of 66 miles (representing the difference between the 443 miles that shipment 3160 moved in traveling from Cadiz to Torrejon Air Base and the 377 miles that this shipment would have moved in traveling from Barcelona to Torrejon Air Base if a commercial ship had been used for the ocean transportation and such ship had landed at Barcelona).

If plaintiff had performed additional land transportation in connection with shipment 3160 because of some action taken by defendant, plaintiff might properly seek additional compensation on the basis of such additional transportation. However, the circumstance that shipment 3160 was debarked at Cadiz instead of Barcelona was not due to any requirement, request, or other action on the part of defendant. Rather, it was because plaintiff voluntarily elected to turn the shipment over to the MSTS for the ocean portion of the movement in order to overcome the difficulty which the maritime strike of December 1962 created for plaintiff in obtaining ocean transportation for this shipment. Plaintiff knew, when it voluntarily turned shipment 3160 over to the MSTS in New Orleans, that the shipment would be debarked at a military ocean terminal in Spain; and plaintiff thus impliedly agreed to assume any extra burden that might be involved in transporting the shipment from the military ocean terminal to Torrejon Air Base.

The present situation is outside the scope of the rule stated by this court in *TOVS*, 426 F.2d at 349, 192 Ct.Cl. at 113, to the effect that the carrier there was entitled to "extra compensation on a *quantum meruit* basis in connection with the performance of additional land transportation from the port of debarkation to the destination point in a situation where the plaintiff's normal routing procedure was frustrated by the defendant, with the result that the port of debarkation actually used was more distant from the destination point than the port ordinarily used in connection with shipments moving from the origin point to the destination point." With respect to shipment 3160 in the present litigation, plaintiff's normal routing procedure was not frustrated by defendant to any extent. It was the maritime strike —for which defendant was not responsible in any way—that frustrated plaintiff's normal routing procedure and caused plaintiff to call on defendant for

assistance in connection with the ocean transportation of shipment 3160.

For the reasons stated, plaintiff is not entitled to recover on its claim based upon the additional land transportation which plaintiff performed when shipment 3160 was debarked at Cadiz rather than Barcelona.

■ Plaintiff also asserts in the present litigation a claim for additional compensation in the amount of $46.58 (representing a minimum diversion mileage charge in the amount of $41.58 and the flat $5 diversion fee) based upon the alleged diversion of shipment 3160 at New Orleans. Plaintiff says in its brief that the surrender of shipment 3160 to the Army Transportation Terminal in New Orleans for ocean transportation aboard an MSTS vessel involved "a change in the routing of * * * [the] shipment" or "an instruction necessary to enable * * * [the] carrier to effect delivery," and, therefore, amounted to a diversion.

However, it is plain from the definition of "diversion" set out in part I of this opinion that "a change in the route" of a shipment constitutes a diversion only when the change is made by the carrier at the request of someone else. In this instance, the change from the anticipated use of a commercial vessel to the use of an MSTS vessel for the ocean portion of the movement was not made pursuant to a request from someone else, but was made at the instigation of plaintiff itself.

Furthermore, an "instruction" amounts to a diversion only when the carrier receives an instruction from someone else and this requires a change in the billing or an additional movement of the car or truck. In this connection, it has been noted previously that the use of an MSTS vessel rather than a commercial ship for the ocean transportation of shipment 3160 was not due to any instruction which plaintiff received from someone else, but was due to plaintiff's own voluntary action.

It is true that defendant's transportation officer in New Orleans did issue a document designated as a "Diversion Order" with respect to shipment 3160, stating that the shipment was "diverted * * * at USATTC(G)" [U. S. Army Transportation Terminal Command (Gulf)] by plaintiff on December 20, 1962. That document, however, was not issued until February 19, 1963, or 2 months after shipment 3160 was loaded aboard an MSTS vessel in New Orleans. Thus, the so-called "Diversion Order" was, in reality, a retroactive confirmation of the acceptance of shipment 3160 by the MSTS for the ocean portion of the movement to Spain, at the request of plaintiff, rather than a directive from the transportation officer requiring plaintiff to change the handling of the shipment.

In connection with plaintiff's claim based on the alleged diversion of shipment 3160 in New Orleans, it is pertinent to note that the evidence does not show—and, indeed, plaintiff in its requested findings of fact does not ask the court to find—that plaintiff first delivered shipment 3160 to a commercial pier in New Orleans and thereafter transferred it to the Army Transportation Terminal so that it could be loaded aboard an MSTS vessel. Thus, it is reasonable to infer that, upon the arrival of shipment 3160 in New Orleans, plaintiff delivered it directly to the Army Transportation Terminal, so that no extra hauling of the shipment between piers in New Orleans was involved. *Cf. TOVS,* 426 F.2d at 349–350, 192 Ct.Cl. at 113–114.

For the reasons indicated, plaintiff's diversion claim on shipment 3160 must be denied, and the petition should be dismissed as to such claim.

The reasoning previously set out in this part of the opinion is equally applicable to, and requires the rejection of, plaintiff's diversion claim on shipment 5820 and plaintiff's claim on a *quantum meruit* basis for increased compensation because of additional land transportation performed in connection with shipment 1340.

## VII. Additional Transportation Allegedly Performed on Mode 5 Shipments

Shipment 3290 was selected by the parties to illustrate plaintiff's claims based upon additional land transportation allegedly performed in connection with Mode 5 shipments.

Shipment 3290 was tendered to plaintiff in the Panama Canal Zone for transportation in Mode 5 to Fort Bragg, North Carolina, which would involve the use of an MSTS vessel for the ocean part of the movement from Panama to the United States. The shipment was transported by an MSTS vessel from Panama to New Orleans, Louisiana, where plaintiff consolidated the shipment with other shipments for further transportation by flat-bed trailer to Fort Bragg.

In the petition and at the trial, plaintiff claimed that shipment 3290 should have been discharged at the port of Charleston, South Carolina, and that plaintiff was entitled to additional compensation in the amount of $93.96 on a *quantum meruit* basis for the additional land transportation which plaintiff was required to perform on shipment 3290 because the shipment was discharged at New Orleans rather than at Charleston.

A similar issue was involved in *TOVS;* and the court held (426 F.2d at 346–347, 192 Ct.Cl. at 109–110) that the carrier, in accepting a shipment for transportation in the Mode 5 service, impliedly agreed to transport the shipment to the destination point from any destination-country MSTS port previously listed by the carrier as being among the ports from which the carrier was willing to provide service on Mode 5 shipments moving from the origin country.

After the decision in *TOVS* was announced, plaintiff informed the commissioner that it was withdrawing its claim

for additional compensation on shipment 3290 with respect to the additional land transportation performed.

### VIII. Shipments Originating Outside Tariff Pickup Radius

Shipments 120, 8720, and 3019 were selected by the parties as illustrating plaintiff's claims based on additional land transportation allegedly performed in picking up shipments at points outside the pickup radius prescribed in an applicable tariff provision.

■ The evidence in the record shows that shipment 120 was picked up by plaintiff at a point in the Philippine Islands outside the applicable pickup radius prescribed in Section IV of Supplement 3 to Military Rate Tariff No. 6, and that shipment 8720 was picked up at a point in Japan outside the applicable pickup radius prescribed in the same section.

However, the evidence also shows that plaintiff has already been paid the amount of $64.23 claimed for the additional land transportation performed in connection with shipment 120. Therefore, plaintiff is not entitled to any additional recovery on shipment 120.

With respect to shipment 8720, defendant concedes that plaintiff was originally entitled to receive compensation for the additional land transportation performed in picking the shipment up at a point outside the applicable tariff pickup radius. Defendant contends, however, that plaintiff's claim on shipment 8720 is now barred by the pertinent statute of limitations. This contention is rejected in part XVIII of the opinion. Consequently, plaintiff is entitled to recover on its claim relative to shipment 8720.

The evidence in the record shows that shipment 3019 was not picked up by plaintiff outside the applicable tariff pickup radius. Plaintiff stated in its requested findings of fact that it was withdrawing its claim for additional compensation on the ground that shipment 3019 allegedly originated outside the applicable tariff pickup radius.

### IX. Shipments Allegedly Packed At Non-Temporary Storage Origins

Shipments 4240 and 5080 were selected by the parties to illustrate a controversy that arose over the question of whether, when a shipment was in non-temporary storage at the origin point and it appeared that plaintiff packed some of the household goods prior to transporting them, plaintiff was entitled to be compensated for the transportation on the basis of the full single-factor rate from origin to destination, without showing either that no preliminary packing of the household goods was performed prior to storage or, in the alternative, that the repacking of such household goods was directed by a transportation officer.

A similar controversy was involved in *TOVS*, and the court held (426 F.2d at 344–345, 192 Ct.Cl. at 104–106) that a carrier picking up a shipment from non-temporary storage, and performing some preliminary packing of the household goods prior to the movement was not entitled to charge the full line-haul transportation rate unless the carrier proved either that no preliminary packing of the household goods was performed by anyone else prior to storage, or that the repacking was directed by a transportation officer of the defendant.

After the decision in *TOVS* was announced, plaintiff informed the commissioner that it was withdrawing its claim on shipment 4240.

In connection with shipment 5080, plaintiff was actually paid the full single-factor transportation rate from origin to destination. Plaintiff billed for this shipment (which moved from Marysville, California, to Ramey Air Force Base, Puerto Rico) on the basis of a single-factor rate of $27.45 per cwt. prescribed in Tariff ICC 731; and the bill was paid by defendant.

In the present litigation, defendant filed a counterclaim for the amount of $13.80 on shipment 5080, contending that the line-haul transportation rate of $27.45 per cwt. was subject to the $1.50 per cwt. reduction provided for in MRT No. 16 with respect to shipments originating at non-temporary storage warehouses.

■ Since the evidence in the record fails to show that no preliminary packing was performed on the household goods in shipment 5080 prior to their placement in non-temporary storage, and there is no evidence indicating that defendant directed plaintiff to repack these goods, it must be concluded that the line-haul transportation rate of $27.-45 per cwt. should have been reduced by the $1.50 per cwt. provided for in MRT No. 16 with respect to shipments originating at non-temporary storage warehouses.

In its reply brief, plaintiff does not interpose any objection to a recovery by defendant on its counterclaim with respect to shipment 5080.

### X. Warehouse Handling Allegedly Performed in Government Warehouse

■ Shipments 1040 and 1669 illustrate claims asserted by plaintiff on the basis of warehouse handling allegedly performed in government-owned warehouses.

As indicated in previous portions of this opinion, a carrier of military household goods is sometimes directed, upon the arrival of a shipment at the destination point, to place the shipment temporarily in storage-in-transit pending the issuance of specific directions with respect to the delivery of the shipment to the property owner at his new residence. The SIT may be accomplished in a commercial warehouse or in a government-owned facility, if available. The placement of a shipment in SIT involves the performance of a service known as "warehouse handling."

Warehouse handling is the service of (1) moving a shipment from the platform at the entrance of the storage warehouse to the area within the warehouse where the shipment will remain during the SIT period, (2) the necessary record-keeping, and (3) the reverse movement out to the platform when the shipment is removed from SIT. Warehouse handling is always performed by someone when a shipment is placed in storage-in-transit, and it consists of the same activities irrespective of whether the service is performed in a commercial warehouse or in a government-owned storage facility.

Shipment 1040 originated in Germany and was consigned to the property owner at El Paso, Texas. Upon the arrival of the shipment, plaintiff was instructed by defendant to place the shipment in a government-owned warehouse facility at Fort Bliss for SIT. Fort Bliss is located on the outskirts of El Paso. Subsequently—and again pursuant to a directive from defendant—plaintiff removed shipment 1040 from the government-owned warehouse and delivered it to the property owner in El Paso.

Shipment 1669 originated in Olympia, Washington, and was consigned to Fort Kobbe, Panama Canal Zone. On arrival, the shipment was placed in a government-owned warehouse for SIT pending the issuance of definite delivery instructions.

Plaintiff is asserting claims in the present litigation on the basis of warehouse handling allegedly performed in connection with shipments 1040 and 1669.

The subject of warehouse handling performed in a government-owned warehouse was dealt with in *TOVS;* and the court held (426 F.2d at 350–351, 192 Ct. Cl. at 115–117) that a carrier is entitled to assert a claim when the carrier performs this necessary service in a government-owned warehouse, to the same extent as if the service had been performed by the carrier in a commercial warehouse. However, the evidence in the prior case showed—and the court found as a fact—that the necessary handling of the shipment into and out of the govern-

ment-owned warehouse was performed by the carrier (through its local agent).

In the present litigation, the evidence in the record does not show who performed the necessary warehouse handling service in connection with the placement of shipments 1040 and 1669 in, and their removal from, SIT. The essential warehouse handling service in connection with either shipment may have been performed by plaintiff (or plaintiff's local agent), or it may have been performed by personnel of defendant on duty at the particular government-owned warehouse.

Obviously, plaintiff is not entitled to recover from defendant for warehouse handling performed by defendant in a government-owned warehouse. Consequently, an essential factor is missing in connection with plaintiff's claims with respect to shipments 1040 and 1669, *i. e.*, proof that plaintiff (or its agent) actually performed the necessary warehouse handling in connection with the placement of these shipments in, and their removal from, SIT at the respective government-owned warehouses.

It necessarily follows that the petition should be dismissed as to these claims.

Plaintiff contends in its reply brief that since the evidence indicates that in most instances plaintiff performs the necessary warehouse handling when shipments entrusted to it are placed in SIT at government-owned warehouses, it was encumbent upon defendant to adduce specific proof that, with respect to shipments 1040 and 1669, it was defendant—and not plaintiff—that actually performed the warehouse handling in the respective government-owned warehouses. However, shifting the burden of proof to defendant cannot be justified. Plaintiff must establish in a positive way its right to recover on each claim asserted in the litigation.

## XI. Waiting Time

Shipments 4430, 602, and 2458 illustrate the claims asserted by the plaintiff on the basis of alleged waiting time.

Prior to March 1, 1963, the tariff provision that covered the subject of waiting time was Item 135 of Military Rate Tariff No. 4. It prescribed a rate of $10 per hour per vehicle for waiting time, "not the fault of the carrier," between the hours of 8:00 a. m. and 5:00 p. m., but provided for 3 hours of free waiting time in connection with any shipment traveling 200 miles or more.

On and after March 1, 1963, the tariff provision relative to waiting time was Item 110 of Military Rate Tender No. 20. This provision was substantially the same as Item 135 of Military Rate Tariff No. 4, mentioned in the preceding paragraph. However, Item 110 required the detention of both the vehicle and the driver as the basis for a waiting-time charge, whereas Item 135 required only the detention of the vehicle.

Shipment 4430 originated in France and was consigned to the port transportation officer at Brooklyn Army Terminal in Brooklyn, New York. The government bill of lading stated that the shipment was destined for non-temporary storage, and plaintiff was instructed to notify the port transportation officer on the arrival of the shipment in Brooklyn and prior to placing it in storage. The evidence indicates that the shipment arrived at the destination point on July 30, 1962, and was taken from the pier by plaintiff's local agent. On August 3, 1962, defendant's transportation officer in Brooklyn issued a "Notice of Diversion" directing plaintiff to place shipment 4430 into non-temporary storage at a specified warehouse in Jersey City, New Jersey. Plaintiff (through its agent) accordingly delivered the shipment to the Jersey City warehouse for non-temporary storage.

Plaintiff claims on shipment 4430 additional compensation in the amount of $240 based on alleged waiting time. This amount is computed on the basis of 24 chargeable hours out of a total of 27 hours of alleged waiting time during which the shipment was held by plaintiff's agent before delivery instructions were issued by the transportation officer (*i. e.*, 9 hours per day on July 31, August 1, and August 2, 1962, less the

3-hour free-time allowance applicable to shipments traveling 200 miles or more).

The waiting-time charge was appropriate only in a situation where the waiting was "not the fault of the carrier." With respect to shipment 4430, it traveled from the port of embarkation in France to the port of debarkation in New York aboard a commercial vessel selected by plaintiff. It was plaintiff's responsibility to notify the port transportation officer in Brooklyn upon the arrival of the shipment, so that the transportation officer could issue instructions to plaintiff with respect to the placement of shipment 4430 in non-temporary storage. There is no direct evidence in the record to show when plaintiff (through its agent) actually notified the transportation officer of the arrival of shipment 4430. Plaintiff adduced testimony to the effect that it was customary for plaintiff's destination agents, on receiving an inbound shipment, to notify defendant on the same day that the shipment was available for disposition pursuant to defendant's instructions. However, there is no specific evidence in the record to show that this usual practice was followed in the case of shipment 4430. Thus, it is entirely possible that plaintiff's agent did not give the necessary notice to the transportation officer until August 3, 1962, the date on which the transportation officer issued the diversion order with respect to shipment 4430. It must be concluded, therefore, that plaintiff has failed to prove that the waiting in this instance was "not the fault of the carrier."

Also, the waiting-time charge was applicable only in a situation where a carrier's vehicle was required to wait. In this connection, there is no evidence in the record to show that a vehicle of plaintiff (or its agent) was required to wait for 3 days (or, indeed, for any period of time) because of delay in the receipt of delivery instructions from the transportation officer.

It is pertinent to note that when plaintiff's agent submitted an invoice to plaintiff for pier charges and for pickup, delivery, and unpacking charges in connection with shipment 4430, the invoice did not contain any charge for waiting time. Furthermore, plaintiff did not bill defendant for any waiting-time charge when plaintiff submitted its original bill for the transportation of shipment 4430.

For the reasons indicated, plaintiff is not entitled to recover on its claim for waiting time with respect to shipment 4430, and the petition should be dismissed as to such claim.

What has been said relative to shipment 4430 is equally applicable to plaintiff's claims for waiting time on shipments 602 and 2458. Consequently, the petition should also be dismissed as to such claims.

*XII. Incorrect or Unbilled Charges*

Shipments 1860, 3240, 2798, and 3881 were selected by the parties to illustrate claims for charges which plaintiff originally billed defendant for on an incorrect basis, or which plaintiff failed to include in its bill to defendant.

Shipment 1860 originated in Germany and was consigned to the property owner at an address that was given as Route 3, Prosperity, Newberry County, South Carolina. The shipment was placed in the warehouse of plaintiff's agent at Columbia, South Carolina, on September 24, 1962, for storage-in-transit. Subsequently, on October 5, 1962, the shipment was removed from SIT and was delivered to the residence of the property owner on Route 2, Newberry, South Carolina.

Plaintiff billed defendant, and the latter paid plaintiff, for transporting shipment 1860 from Germany to South Carolina, and for delivering the shipment to SIT. Plaintiff did not include in its bill any charge for the storage-in-transit or for the warehouse handling performed in connection with the SIT.

In the present litigation, plaintiff asserts a claim in the amount of $7.09 for the storage-in-transit and a claim in the same amount for warehouse handling.

Defendant originally admitted liability for the storage-in-transit and warehouse

handling charges claimed by plaintiff with respect to shipment 1860. At the trial, however, defendant disclaimed liability for the SIT and warehouse handling charges, on the ground that the SIT was not authorized by defendant.

The government bill of lading relative to shipment 1860 did not contain any express authorization for storage-in-transit. However, the "Description of Articles" block in the center of the GBL contained (among other things) the following items:

> Date of delivery into SIT: _____
> Date of delivery into RES: _____

The notation referred to in the preceding paragraph can reasonably—and should—be construed as an authorization for storage-in-transit with respect to shipment 1860. Since defendant received the benefit of the storage-in-transit and warehouse handling services performed by plaintiff (through its agent) on shipment 1860 because the property owner was not residing at the address given on the GBL, defendant should pay for such services.

Consequently, plaintiff is entitled to recover on its claims for storage-in-transit and warehouse handling charges with respect to shipment 1860.

Shipment 3240 originated in Germany and was consigned to the property owner at Charleston Air Force Base, South Carolina. Storage-in-transit was authorized, and plaintiff was instructed in the government bill of lading to notify the transportation officer at Charleston Air Force Base upon the arrival of the shipment and prior to placing it in storage.

Upon the arrival of shipment 3240, it was placed in the warehouse of plaintiff's agent at Charleston Heights, South Carolina, on December 4, 1962, for storage-in-transit. Subsequently, on February 1, 1963, the shipment was removed from SIT and was delivered to the property owner at his new residence in North Charleston, South Carolina.

Plaintiff's bill to defendant included (among other things) a charge in the amount of $3.67 for the warehouse handling service performed on shipment 3240. This charge was based upon a provision in Section II of Military Rate Tariff No. 19 which prescribed a warehouse handling rate of 50 cents per net cwt.

In the present litigation, plaintiff originally claimed that the charge for warehouse handling on shipment 3240 should have been $4.17, computed at actual weight (834 lbs.) times 50 cents per 100 lbs., and that plaintiff thus was due an additional amount of 50 cents for the warehouse handling service. Defendant conceded that plaintiff was entitled to recover the additional 50 cents claimed in the suit.

However, plaintiff later revised its claim on shipment 3240 and now contends that the charge for warehouse handling should have been $5, computed on the basis of 50 cents per 100 lbs. applied to a minimum weight of 1,000 lbs., as provided for in Item 185B of Supplement 17 to Military Rate Tariff No. 4. Thus, plaintiff is now seeking to recover an additional amount of $1.33 for the service of warehouse handling on shipment 3240.

The question to be decided relative to plaintiff's present claim for warehouse handling on shipment 3240 is whether this charge should be computed under the rate set out in Military Rate Tariff No. 19, as originally asserted by plaintiff and still contended by defendant, or under the rate set out in Military Rate Tariff No. 4, as now contended by plaintiff.

Shipment 3240 actually moved under the provisions of Military Rate Tariff No. 19. That tariff contained in Section II a provision which related to the subject of warehouse handling and stated in part as follows:

> 2. All shipments consigned to storage-in-transit are subject to a warehouse handling charge of fifty cents ($.50) per net cwt. * * *

It will be noted, however, that the provision just quoted was not applicable to shipment 3240, because this shipment

was not consigned to storage-in-transit. It was consigned to the property owner at Charleston Air Force Base.

 As indicated in part V of this opinion, Military Rate Tariff No. 19 contained a note under the heading of "Rules, Regulations and Additional Services" which stated that "For service charges that are not included in the transportation rates (EXCEPT for service charges provided herein), refer to Military Rate Tariff ICC No. 4." Accordingly, since MRT No. 19 did not have any provision prescribing a warehouse handling rate (except for shipments consigned to SIT), the proper rate for the service of warehouse handling on shipment 3240 was, as now contended by plaintiff, the rate set out in Military Rate Tariff No. 4 and generally applicable to shipments placed in SIT. The pertinent rate was 50 cents per cwt. based on actual weight, but this was subject to a 1000-pound minimum.

Hence, plaintiff is entitled to recover on its revised claim for additional compensation in connection with the performance of the warehouse handling service on shipment 3240.

In connection with shipment 2798, plaintiff's bill to defendant did not include any charges for storage-in-transit, for warehouse handling, or for delivery from SIT to the property owner's residence. Plaintiff asserts claims for such charges in the present litigation. The amounts claimed are $107.46 for SIT, $17.91 for warehouse handling, and $74.-63 for delivery from SIT.

Defendant has admitted liability for the additional charges claimed with respect to shipment 2798.

In billing defendant for the service of delivering shipment 3881 from SIT to the property owner's residence, plaintiff computed this charge on the basis of a rate of $2.20 per cwt. In the present litigation, plaintiff asserts that this charge should have been computed at the rate of $2.50 per cwt. under Item 145 of Military Rate Tender No. 20.

Defendant has admitted liability to plaintiff for additional compensation in connection with the delivery of shipment 3881 from SIT, based on the rate of $2.50 per cwt. The amount claimed, and the amount conceded to be due, is $10.35.

*XIII. Claims on Quantum Meruit Basis*

The parties selected shipments 6260, 5080, 4960, 2500, 2520 and 4277 to illustrate claims asserted by plaintiff on a *quantum meruit* basis.

In its reply brief, plaintiff informed the commissioner that it was withdrawing the *quantum meruit* claims based on shipments 2500, 2520 and 4277. Consequently, it is not necessary to discuss these particular claims.

 Shipment 6260 originated in Midland, Texas and was consigned to the transportation officer at Naha Air Base in Okinawa, for Lt. Edward F. Lopez. Storage-in-transit was authorized, and plaintiff was instructed to notify the transportation officer prior to placing the shipment in SIT. On the arrival of shipment 6260 in Okinawa, plaintiff notified the transportation officer at Naha Air Base, and the transportation officer instructed plaintiff to deliver the shipment to the property owner at his new residence in the town of Oroku, Okinawa.

Plaintiff has been paid charges for packing shipment 6260 and transporting it from Texas to Okinawa.

In the present litigation, plaintiff asserts a diversion mileage claim in the amount of $22 with respect to the alleged diversion of shipment 6260 from Naha Air Base to the owner's residence in Oroku, plus a flat $5 diversion charge.

At the time when shipment 6260 moved, plaintiff did not have any rates applicable to land transportation performed between points in Okinawa. The diversion mileage charge claimed in the present case is based on the rates which were set out in Section V of Military Rate Tariff No. 3, and which were applicable to land transportation performed

between points in Japan. The claim for $5 is based on Item 155 of the same tariff.

The primary question presented in connection with plaintiff's claim on shipment 6260 is whether there was a diversion of this shipment.

In the present instance, when shipment 6260 was tendered to plaintiff for transportation, it was not known just where the property owner would be residing after he began his new duty assignment at Naha Air Base. Plaintiff undoubtedly understood when it received the shipment for transportation, that delivery instructions after the arrival of the shipment in Okinawa might involve delivery to Government-owned quarters at Naha Air Base or to some other residence address located within a designated geographical area—the Island of Okinawa, a U. S. military installation under military control which includes the town of Oroku. Oroku obviously could not be considered as a *different city* so as to constitute diversion by a change of destination such as the diversion we have found in the case of shipment 6940 from the City of Montgomery, Alabama to the City of Prattville, Alabama under Sec. I, "Alleged Diversion to New Point Without SIT (Storage-in-Transit)." Furthermore, at the time that shipment 6260 moved, plaintiff did not have any rates applicable to land transportation performed between points in Okinawa. The diversion mileage charge claimed on shipment 6260 is based on the rates in Section V, Bureau MRT No. 3, which is applicable to land transportation performed between points in Japan, and the claim for $5 is based on Item 155 of the same tariff. Even though the trial commissioner has found that the circumstances surrounding the transportation of household goods in Japan and in Okinawa are virtually identical, this is not sufficient evidence for us to find that the rates for diversion and mileage should be identical. Although Okinawa, unlike Japan, is a small island of only 454 square miles in area, it was an important military destination, and if plaintiff had intended to charge diversion rates for land transportation therein, it should have filed tariffs by which such rates could be determined. Consequently, plaintiff is not entitled to any additional compensation for diversion in effecting this delivery. The petition should be dismissed as to the claim asserted by plaintiff on shipment 6260.

██ Shipment 5080 (which has been mentioned previously in Part IX of this opinion) was tendered to plaintiff for transportation from Marysville, California to Ramey Air Force Base, Puerto Rico. The Government bill of lading was executed by the transportation officer at Beale Air Force Base, California, which is located about 11 miles from Marysville. Shipment 5080 was consigned to the traffic management officer at Ramey Air Force Base, for M/Sgt. John E. Varley. Storage-in-transit at destination was authorized, and plaintiff was instructed to notify the transportation officer at Ramey Air Force Base prior to placing the shipment in storage. On the arrival of shipment 5080 in Puerto Rico, plaintiff notified the transportation officer at Ramey Air Force Base, and plaintiff was instructed to deliver the shipment to the property owner at his quarters on the base.

After performing the transportation service on shipment 5080, plaintiff submitted to defendant a bill based on the rate set out in plaintiff's Special Quotation No. 731. That special quotation stated that it was applicable to shipments moving from Beale Air Force Base, California. Defendant paid the amount requested by plaintiff.

In the present litigation, plaintiff asserts claims (1) in the amount of $5 for the alleged diversion of shipment 5080 from the traffic management officer at Ramey Air Force Base to the property owner, and (2) in the amount of $334.42 as additional compensation in connection with the transportation of shipment 5080 from Marysville to Ramey Air Force Base.

Plaintiff's claim for $5 must be denied, since there was no diversion of

shipment 5080 in Puerto Rico. Although the shipment was nominally consigned on the Government bill of lading to the traffic management officer at Ramey Air Force Base, the GBL plainly showed that the shipment was destined for M/Sgt. John E. Varley. Plaintiff certainly knew that its obligation was to deliver the shipment of household goods to the property owner, and place them in his new residence. Delivery of the household goods to the traffic management officer at Ramey Air Force Base would not have discharged plaintiff's obligations.

■ Plaintiff's claim for additional compensation in connection with the transportation of shipment 5080 is based on the contention that its Special Quotation No. 731 was applicable only to shipments originating within the geographical limits of Beale Air Force Base; that its charge for the transportation of shipment 5080 from Marysville, California, which is located a distance of about 11 miles from Beale Air Force Base, should be allowed on a *quantum meruit* basis; and that an appropriate guide to use in this respect was a tariff which was issued by Advance Container Transit, Inc. (an unregulated forwarder of military household goods) and which prescribed transportation rates applicable to shipments of military household goods moving in the door-to-door-container mode from points in the United States, including Marysville, California, to points in Puerto Rico (among others). This contention on the part of plaintiff must be rejected.

In the first place, the evidence in the record shows that the Department of Defense has assigned to the transportation officers at specified military installations the responsibility for making the necessary arrangements for the transportation of military household goods when members of the armed forces located at such installations, or within designated geographical areas surrounding the respective installations, are transferred to overseas assignments. This is known to members of the household goods transportation industry, including plaintiff, since they have often handled shipments of military household goods from origin residences located outside the military installations where the Government bills of lading were issued. Consequently, when plaintiff submitted to defendant its Special Quotation No. 731 on shipments moving from Beale Air Force Base, California, plaintiff was undoubtedly indicating its willingness to handle under that quotation any shipments of military household goods originating within the jurisdiction of the transportation officer, and within designated geographical areas surrounding Beale Air Force Base. Accordingly, shipment 5080, which originated 11 miles from Beale Air Force Base and within the territorial jurisdiction of the transportation officer at that base, should be regarded as subject to the provisions of plaintiff's Special Quotation No. 731.

For the reasons indicated, plaintiff is not entitled to recover on its *quantum meruit* claims with respect to shipment 5080, and the petition should be dismissed as to such claims.

The discussion previously set out in connection with shipment 5080 requires the rejection also of plaintiff's *quantum meruit* claims with respect to shipment 4960, based on the unsound contention that plaintiff's Special Quotation No. 894, which stated that it was applicable to shipments originating at the Naval Supply Depot, San Diego, California, could not properly be applied to shipments originating elsewhere in the City of San Diego and, accordingly, that compensation for the transportation of shipment 4960 should be allowed on a *quantum meruit* basis, using the tariff of Advance Container Transit, Inc. as the guide.

Therefore, the petition should be dismissed as to plaintiff's *quantum meruit* claims on shipment 4960.[5]

---

5. Defendant concedes that plaintiff, in submitting its bill under Special Quotation No. 894 with respect to shipment 4960, failed to include a charge for one period of storage, and that plaintiff is entitled to collect the additional sum of $32.78 for such storage.

*XIV. Plaintiff's Special Quotations*

■ Shipments 1160, 1560, 5460, 4568, 5280, 1320 and 2400 were selected by the parties to illustrate a controversy that arose over the question of (a) whether special quotations which plaintiff submitted to defendant were effective (as contended by defendant) or ineffective (as contended by plaintiff), and (b) if found to be effective, whether they applied to the particular shipments in question.[6]

At all material times prior to March 1, 1963, the Household Goods Carriers' Bureau ("the Bureau") had on file with the Department of Defense a succession of tariffs or tenders prescribing rates for shipments of military household goods. Each tariff or tender was submitted by the Bureau on behalf of its members, including plaintiff. Insofar as plaintiff was concerned, the Bureau acted on plaintiff's behalf pursuant to an unrestricted power of attorney previously executed by plaintiff.

On and after March 1, 1963, the Bureau had Military Rate Tender No. 20 on file with the Department of Defense at all material times. This tender, which incorporated the provisions of the Uniform Military Basic Tender discussed in *TOVS*, 426 F.2d at 332–333, 192 Ct.Cl. at 84–86, was filed by the Bureau on behalf of its members, including plaintiff. The Bureau's authorization from plaintiff was the power of attorney previously mentioned.

Plaintiff's power of attorney to the Bureau did not purport to be an exclusive delegation of tariff-publishing authority, and it did not state that plaintiff was thereafter to be without any authority to submit separate tariffs or tenders to the Department of Defense on its own behalf. In order to meet competition from other carriers, plaintiff would sometimes file with the Department of Defense a special quotation offering rates on the transportation of military household goods that were lower than the rates set out in the then-current tariff or tender filed with the Department of Defense by the Bureau on behalf of its members, including plaintiff.

Shipment 1160, selected by the parties to illustrate part (a) of this issue originated in Rutherfordton, North Carolina, and was destined to Ramstein Air Base in Germany under a Government bill of lading issued by the transportation officer at Fort Bragg, North Carolina. Plaintiff performed the transportation from North Carolina to Germany, as requested.

At the time when shipment 1160 moved, the Bureau had on file with the Department of Defense the Bureau's Military Rate Tariff No. 16, which (among other things) quoted a rate of $36.60 per cwt. on the transportation of military household goods from North Carolina to Germany. The Bureau filed MRT No. 16 on behalf of its members, including plaintiff.

Subsequent to the filing of MRT No. 16 by the Bureau, and prior to the movement of shipment 1160, plaintiff individually submitted its Special Quotation No. 598 to the Department of Defense. This special quotation offered to transport military household goods from North Carolina to Germany at a rate of $26.55 per cwt.

After transporting shipment 1160 from North Carolina to Germany, plaintiff billed defendant for a transportation charge in the amount of $233.64, based on a rate of $26.55 per cwt. The bill cited plaintiff's Special Quotation No. 598 as applicable to shipment 1160. Defendant paid the amount requested by plaintiff.

In the present litigation, plaintiff contends that it did not revoke the power of attorney which it had executed in favor of the Bureau, nor authorize the Bureau to publish an appropriate exception in the Bureau publication excluding therefrom

---

6. In its reply brief, plaintiff informed the commissioner that it was withdrawing its claim on shipment 1320 as to part (b) of this issue. That is, if these special quo-

tations are found to be effective, plaintiff concedes that the special quotation which purported to cover shipment 1320 was, in fact, applicable to that shipment.

the services and rates in question that its Special Quotation No. 598 was ineffective, because the power of attorney which plaintiff had executed in favor of the Bureau precluded plaintiff from thereafter submitting an individual tariff or tender relative to the transportation of military household goods; that at the time when shipment 1160 moved, the only valid rate for such a shipment moving from North Carolina to Germany was the one set out in MRT No. 16; and that plaintiff is accordingly entitled to additional compensation in the amount of $88.44 on the transportation of shipment 1160.

At trial, defendant presented witnesses who were in charge of, or directly connected with, carrier selection and traffic supervision for the military installation at which they performed their duties. In response to questions concerning the method by which an individual carrier was chosen to transport a particular shipment of household goods, these officials testified, without contradiction, that in an ordinary situation, all carriers within the *same cost factor* were selected on the basis of a rotation system. This system sought to equalize the amount of business apportioned each carrier. However, in each case, a cost comparison was conducted with the result that the group of carriers, represented by a uniform tariff, or the individual carrier, represented by a special quotation, which proposed the lowest price per shipment, received the greatest portion of tonnage. This practice is quite consistent with the long established rule that where two descriptions and tariffs are equally appropriate, the shipper (in this case defendant) is entitled to have applied the one specifying the lower rate. United States v. Gulf Refining Co., 268 U.S. 542, 546, 45 S.Ct. 597, 69 L.Ed. 1082 (1925). Indeed, plaintiff's admitted reason for submitting these special quotations was to maintain its industry position by remaining within the same cost factor as its competitors.

Thus, it is clear that the volume of business plaintiff received from defend-

ant was dependent, in part, upon the competitively reduced rates it filed in addition to the Bureau's uniform tariff. We find, therefore, that plaintiff, after obtaining this business by inducing defendant to rely on its special quotations, is estopped from denying the validity of these special quotations. More specifically, in the example given above, plaintiff is estopped from denying the validity of Special Quotation No. 598. It would be unconscionable to permit plaintiff to profit from what, it now concedes was, in effect, a deceptive practice perpetrated against defendant.

Hence, it is not necessary to decide whether the power of attorney which plaintiff gave the Bureau actually precluded plaintiff from thereafter submitting any individual tariff or tender with respect to the transportation of military household goods.

Having established the validity of these special rate quotations, we must now determine whether plaintiff's quotations, which designated a specific military installation, but provided for no mileage or origin radius, were nevertheless, applicable to shipments which originated at points beyond the geographical boundaries of the named installation.

For example, shipment 5460 originated at 8029 Klamath Road, Pocahontas Village, which is a district in the City of Virginia Beach, Virginia, and is about 18 miles from Norfolk, Virginia. The shipment was consigned to the property owner at Pearl Harbor on the Island of Oahu, Hawaii. The Government bill of lading on shipment 5460 was issued by the transportation officer at the Naval Supply Center, Norfolk, Virginia. Plaintiff performed the transportation from origin to destination, as requested by defendant.

At the time when shipment 5460 moved, plaintiff's Special Quotation No. 596 and MRT No. 16, to which plaintiff was a party, were both on file with the military authorities.

Item 3 of plaintiff's Special Quotation No. 596 and the attached rate schedule

stated that the quotation applied to shipments moving "FROM: NAVAL SUPPLY CENTER, NORFOLK, VA." Item 15 of the quotation stated that, except as otherwise provided in Items 11 and 12 thereof (relating to the attached rate schedule and the applicable minimum weight per shipment), services covered by the quotation were subject to the terms and provisions of the Bureau's Military Rate Tariff No. 16.

Section III of Supplement 5 to the Bureau's Military Rate Tariff No. 16 contained rates applicable to shipments of household goods moving from Norfolk, Virginia, and points within a 40-mile radius thereof, to the Island of Oahu, Hawaii. These rates were in effect at the time when shipment 5460 was tendered by defendant and transported by plaintiff. A rate under MRT No. 16 was higher than the corresponding rate under plaintiff's Special Quotation No. 596 for similar service.

After transporting the shipment, plaintiff billed defendant for, and was paid, a transportation charge in the amount of $532.95, based on the rate of $25.50 per cwt. set out in plaintiff's Special Quotation No. 596.

Plaintiff now asserts a claim for additional compensation in the amount of $146.30 with respect to the transportation of shipment 5460, based on the rate of $32.50 per cwt. set out in Section III of Supplement 5 to the Bureau's Military Rate Tariff No. 16.

Plaintiff contends that a special quotation which names a military installation without an origin radius cannot apply to shipments which originate beyond the geographical boundaries of the base. It is plaintiff's position that such shipments move under the terms of the pertinent MRT which, both parties agree, covers the origin of said shipments.

However, we agree with defendant that, regardless of plaintiff's subjective intent, these special quotations are most reasonably interpreted as indicating a willingness by the carrier to service the needs and requirements of the military personnel stationed at the named military installation, provided that they are subject to the territorial jurisdiction of the base transportation officer, and that the point of origin of the particular shipment in question is within a designated geographical area surrounding the base.

Shipment 5460 presents the identical problem posed by shipment 5080, for which plaintiff claimed compensation on a *quantum meruit* basis. With respect to the latter shipment, it was concluded that plaintiff's special quotation, which contained no origin radius, was applicable to a shipment which originated 11 miles from the named installation, for the reason that it was common knowledge among carriers that a significant portion of the military household goods traffic, generated by a base transportation officer, originated at personnel residences outside the physical boundaries of the base itself, but within designated geographical areas surrounding the respective installation. This reasoning applies with equal force to shipment 5460 and all other shipments with similar facts which were chosen by the parties to illustrate this issue.

Our conclusion is buttressed by the fact that in certain instances, the military installation named in the special quotation could not generate, within its own geographical confines, enough significant household transportation business to render the quotation meaningful. For example, with regard to Special Quotation No. 596 which purportedly applied only to the Naval Supply Center, Norfolk, Va., there has never been any living quarters for military personnel at the Center from which such shipments of goods could be originated.

In addition, plaintiff's special quotations were issued to meet price competition from other similarly situated carriers. Therefore, it would have been entirely reasonable for defendant to interpret plaintiff's quotations with the same breadth as that accorded the competitor's quotations.

It should be noted that, although shipment 5460 was released to plaintiff at a

valuation of 30 cents per pound per article, Special Quotation No. 596 which is under consideration in connection with said shipment, was drawn so as to apply to shipments released at their full value. However, the restriction of plaintiff's possible liability on shipment 5460 was to plaintiff's benefit, and we believe, for the reasons previously stated, that plaintiff is estopped from denying the validity of Special Quotation No. 596.

Finally, shipment 4568 is the basis for a counterclaim by defendant, on the ground that the transportation charge for this shipment should have been computed under plaintiff's Special Quotation No. 868, instead of on the basis of the higher rate set out in the Bureau's Military Rate Tariff No. 16. Having concluded that plaintiff's special quotations were valid for the purposes for which they were issued, and applicable to the shipments in question, it follows that defendant is entitled to recover on its counterclaim with respect to shipment 4568. For the reasons hereinbefore stated, the petition should be dismissed as to plaintiff's claims on shipments 1160, 1560, 5460, 5280, 1320 and 2400.

### XV. Loss of Containers

Shipments 1680 and 6980 illustrate plaintiff's claims based upon the loss of containers in a situation where a shipment was being transported by plaintiff in containers owned by it and defendant ordered that the shipment be delivered in such containers to a warehouse for non-temporary storage, the warehouse being operated by a company other than plaintiff (or its agent).

When household goods are tendered to a carrier for transportation in the door-to-door container service (or in Mode 5), the household goods are packed and loaded at the origin residence into specially designed containers belonging to the carrier. Then, at the destination residence, the household goods are unpacked from the containers and placed in the residence; and the containers, with the necessary packing materials, are retained by the carrier. There is no pro-vision in defendant's regulations permitting a carrier, without express authorization from defendant, to remove household goods from the containers prior to effecting delivery to the property owner's residence.

Sometimes, it is not feasible for a carrier to deliver a shipment of military household goods to the destination residence of the property owner, and defendant instructs the carrier to deliver the shipment, in the carrier-owned containers, to a warehouse for non-temporary storage, the warehouse being operated by some company with which the carrier has no connection. In such a situation, the carrier loses possession and control of its containers. That was what happened in connection with shipments 1680 and 6980; and plaintiff's containers were never returned to it.

As the court said in *TOVS*, 426 F.2d at 346, 192 Ct.Cl. at 107–108, there was an implied contractual obligation on the part of defendant to permit a carrier to retain its containers upon the completion of the transportation service which the carrier was obliged to perform under the contract between the parties; and defendant failed to discharge its implied contractual obligation in this respect when defendant directed the carrier to deliver a shipment, while still in the carrier's containers, for non-temporary storage in a warehouse operated by a company with which the carrier had no agency or other relationship. Consequently, plaintiff in the present case, like the carrier in *TOVS*, is entitled to recover the reasonable value of the containers which it lost due to the placement of shipments 1680 and 6980 in non-temporary storage pursuant to defendant's instructions.

The evidence in the record indicates that containers of the sort used for shipment 1680 had a reasonable value, when in good condition, of $50 each; and that the three different sizes of containers used for shipment 6980 had reasonable values, when in good condition, of $25, $40, and $50, respectively. Unfortunately, the evidence in the present record does

not show the actual condition of any of these containers at the times when the two shipments were placed in non-temporary storage and plaintiff lost its containers by virtue of such action.

Since the containers in question were capable of being used for the transportation of household goods, they obviously had some value at the time of their loss. This is sufficient for present purposes, inasmuch as the initial judgment is to be entered on the issue of liability only, with the amount of plaintiff's recovery on any claim being reserved for subsequent proceedings under Rule 131(c).

Accordingly, plaintiff is entitled to recover on its claims for the loss of the containers used in connection with shipments 1680 and 6980.

### XVI. The "Normal Port" Issue

When instituted, the present litigation, like *TOVS*, 426 F.2d at 333–337, 192 Ct. Cl. at 85–91, involved the so-called "normal port" issue. Shipments 4970 and 2620 were selected by the parties to illustrate plaintiff's claims based on this issue.

After the court's decision in *TOVS* was announced, defendant conceded that plaintiff is entitled to recover the amount of its "normal port" claim (96.04) with respect to shipment 4970.

Conversely, plaintiff informed the commissioner, after the court's decision in *TOVS* was announced, that it was withdrawing its "normal port" claim with respect to shipment 2620.

### XVII. Area Surcharge

Shipments 3040 and 3240 were selected by the parties to illustrate claims submitted by plaintiff for area surcharges under a provision in Military Rate Tariff No. 1–B which authorized a surcharge of 30 cents per cwt. on shipments originating in, or destined to, certain specified cities or areas.

Defendant has admitted liability for the surcharge claimed with respect to shipment 3040.

On the other hand, plaintiff informed the commissioner in its reply brief that the surcharge claim on shipment 3240 was being withdrawn.

### XVIII. See Limitations Issue

Shipments 1669, 602, and 8720 were selected by the parties to illustrate a controversy that arose as to whether claims on shipments that moved in the motor-van-sea-van service under multiple-factor rates are subject to the 3-year limitations period prescribed in Section 204a of the Interstate Commerce Act (49 U.S.C. § 304a), or to the 6-year limitations period prescribed generally in 28 U.S.C. § 2501 with respect to the assertion of claims in this court.

This particular point is moot in so far as shipments 1669 and 602 are concerned, since it has been pointed out in parts X and XI, respectively, of this opinion that plaintiff is not entitled to recover on its claims relating to these shipments in any event.

Shipment 8720 has previously been mentioned in part VIII of this opinion. It was tendered by defendant to plaintiff at Green Park, Japan, for transportation to Honolulu, Hawaii, in the motor-van-sea-van service under multiple-factor rates (*i. e.*, separate rates for (1) the land transportation in Japan, and (2) the water transportation from Japan to Hawaii and delivery to any point on the Island of Oahu). Green Park is located 40 miles from Yokohama, Japan. Plaintiff transported shipment 8720 to Honolulu, where it was placed in storage-in-transit. Subsequently, it was delivered to the property owner's residence on the Island of Oahu.

Plaintiff billed defendant for the transportation of shipment 8720 from Yokohama to Honolulu, for storage and warehouse handling in Honolulu, and for the delivery of the shipment from SIT to the property owner's residence. Defendant paid these charges by means of two remittances, one payment having been made on February 3, 1960, and the second payment having been made on April 14, 1960.

The petition in case No. 259–65, seeking (among other things) additional compensation in the amount of $43 for the land transportation performed on shipment 8720 in Japan from Green Park to Yokohama, was filed on July 30, 1965. Thus, the petition was filed more than 3 years, but less than 6 years, after plaintiff's cause of action with respect to shipment 8720 accrued.

Section 204a of the Interstate Commerce Act (49 U.S.C. § 304a) provides in part as follows:

(1) All actions at law by common carriers by motor vehicle subject to this chapter for the recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after.

The term "this part" in the quotation refers to Part II of the Interstate Commerce Act, relating to motor carriers.

Plaintiff is a certificated motor carrier under Part II of the Interstate Commerce Act with respect to the performance of transportation services in the United States. Plaintiff contends, however, that in performing the transportation services on shipment 8720 for the Department of Defense, including such transportation as was performed in Hawaii, plaintiff was not subject to Part II of the Interstate Commerce Act, but, rather, that it was operating as an exempt freight forwarder of used household goods by virtue of Section 402(b) (2) of Part IV of the Interstate Commerce Act (49 U.S.C. § 1002(b) (2)).

The Interstate Commerce Commission, in a proceeding entitled Kingpak, Inc., Investigation of Operations, 103 M.C.C. 318 (1966), considered the question of whether the present plaintiff and certain other companies transporting military household goods for the Department of Defense were or were not acting as exempt freight forwarders. The ICC decided this question in the affirmative. Subsequently, the administrative decision in Kingpak, Inc., was upheld by a 3-judge court in Household Goods Carrier's Bureau v. United States, 288 F. Supp. 641 (N.D.Cal.1968), affirmed, 393 U.S. 265, 89 S.Ct. 477, 21 L.Ed.2d 426 (1968).

In Kingpak, Inc., 103 M.C.C. at p. 325, the ICC described a freight forwarder "as one who specializes in the transportation of less-than-carload and less-than-truckload freight and who undertakes to see to it that freight is carried from a point of origin to a point of destination," utilizing "the services of carriers by rail, water, or motor vehicle, separately or in combination, in order to accomplish the movement economically and expeditiously."

After concluding that the independent forwarders involved in the proceeding were operating under the exemption of Section 402(b) (2) in transporting military household goods for the Department of Defense, and that the companies (including the present plaintiff) which held certificates as motor carriers were performing the same type of service for the Department of Defense, the ICC said (103 M.C.C. at 334) that "such a service cannot constitute forwarding when performed by one party and motor carrier operations when rendered by another."

The ICC noted (103 M.C.C. at 335) that there was one difference between the operations of the authorized motor carriers and the operations of the independent forwarders, i. e., the certificated carriers moved shipments for the Department of Defense under rates filed pursuant to Section 22 of the Interstate Commerce Act, whereas independent forwarders were not required to file rates. The ICC regarded this as "a matter of form rather than substance," and said that there was "no reason why regulated motor carriers may not function in the capacity of forwarders under the section 402 (b) (2) exemption so long as they make this known to the public and conduct their exempt operations in such a manner as not to affect the service rendered under their outstanding certificates."

The decision of the ICC in Kingpak, Inc., supports the contention of the present plaintiff that it was operating as

an exempt freight forwarder in transporting shipment 8720 for the Department of Defense.

Defendant argues, however, that the 3-year limitations period prescribed in Section 204a of the Interstate Commerce Act must be applied to plaintiff's claim on shipment 8720 by virtue of this court's decision in Von Der Ahe Van Lines, Inc. v. United States, 358 F.2d 999, 175 Ct.Cl. 281 (1966), cert. denied, 385 U.S. 837, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966). That case involved claims arising out of the transportation of household goods for the Government between points in the United States and points in Germany. Separate rates were prescribed for the land transportation in the United States, for the water transportation, and for the land transportation in Germany. Bills for the transportation charges were submitted by the carrier and were paid by the Government. More than 3 years later, the carrier sued for additional compensation with respect to the German portion of the carriage. The Government defended on the ground of the 3-year limitations period, and this defense was sustained by the court.

In the Von Der Ahe Van Lines case, the carrier did not contend that it was operating as an exempt freight forwarder in transporting the particular shipments. The petition alleged that the claimant was a common carrier by highway of property in interstate commerce, but the claimant argued that its German operations (which were the activities directly involved in the suit) were outside the jurisdiction of the Interstate Commerce Commission and, therefore, that claims arising from such foreign operations were not subject to the 3-year limitations period prescribed in Section 204a of the Interstate Commerce Act.

The court said that if the carrier had sued to recover freight charges for the portion of the carriage which took place within the United States, the 3-year statute of limitations would have been applicable; and that, because of the general rule against splitting or dividing a claim for the purpose of maintaining separate suits on the various parts, the 3-year statute of limitations should be applied as well to claims arising out of the German portion of the carriage.

The court did not have before it in the Von Der Ahe Van Lines case the question of whether the carrier was operating as an exempt freight forwarder. Consequently, the prior decision does not necessarily require the application of the 3-year limitations period to plaintiff's claim on shipment 8720 in the present case, which presents directly the question of whether plaintiff was operating as an exempt freight forwarder in transporting shipment 8720.

It is my opinion that plaintiff's claim on shipment 8720 was subject to the 6-year limitations period prescribed in 28 U.S.C. § 2501, and was not subject to the 3-year limitations period prescribed in Section 204a of the Interstate Commerce Act. Accordingly, since plaintiff's claim on shipment 8720 was asserted in this court less than 6 years after the cause of action accrued, it is not time-barred.

### XIX. The Estoppel and Laches Issues

Defendant asserts that such of plaintiff's claims as are otherwise meritorious should be barred by the equitable doctrines of estoppel and laches.

As indicated in part XIV of this opinion, defendant's estoppel argument is regarded as sound with respect to attempts by plaintiff to deny the validity of the special quotations which plaintiff submitted to defendant and by virtue of which plaintiff induced defendant to turn shipments of military household goods over to the plaintiff for transportation. On the other hand, it is my opinion that the doctrine of estoppel should not be applied to bar any of the other claims of plaintiff which have been found to be meritorious.

It is true that most of the claims on which plaintiff is now suing were not involved in the initial bills which plaintiff submitted to defendant in connection with the respective shipments, and which defendant paid upon presentation. Sub-

sequently, after plaintiff had engaged the services of two auditing firms to go over its accounts with the Department of Defense for the transportation of military household goods, plaintiff presented to the Department of Defense supplemental bills asking for charges which were not included in the original bills, or asking for additional amounts in connection with charges previously made. In this connection, however, if plaintiff initially failed to bill defendant for—and defendant failed to pay plaintiff—the correct amount that was due for transporting a particular shipment of military household goods, there would seem to be no sound basis for permitting defendant, on the ground of estoppel, to withhold the proper amount from plaintiff. Defendant has not suffered a detriment, but, on the contrary, has had the continued use of funds which plaintiff was entitled to receive several years ago.

Defendant appears to base its defense of laches, in the first place, upon the circumstance that the many thousands of separate claims involved in the several hundred cases filed by carriers of military household goods present such a burdensome processing problem for the concerned agencies of the Government that, as a practical matter, such claims cannot be processed by the agencies unless their present levels of personnel are substantially increased. With regard to this argument, the fact that the processing of a vast number of claims against the Government would involve a great deal of trouble and expense has not, up to this point, been regarded as a proper basis for the rejection of just claims.

In the second place, the evidence indicates that defendant (apparently in reliance on the 3-year period of limitations prescribed in Section 204a of the Interstate Commerce Act) has customarily destroyed all documents relating to a particular shipment of military household goods 4 years after making payment on such shipment, if the amount of the payment was less than $100. The documents relating to some of the shipments involved in the present litigation—but not selected as illustrative shipments for the purposes of the instant proceeding—were destroyed in accordance with this practice. However, it is not known whether defendant has actually destroyed the documents in connection with any shipment of a type as to which a decision favorable to plaintiff on the issue of liability is rendered in the instant proceeding. Hence, the defendant's practice of destroying documents after 4 years may not have any practical significance in connection with the present litigation. In any event, the action of defendant in destroying documents after 4 years would not, in my opinion, be a proper basis for disallowing a just claim, particularly in view of the circumstance that the claim would not be time-barred until after 6 years had elapsed subsequent to the accrual of the cause of action.

Of course, if it should subsequently develop that defendant's records have actually been destroyed with respect to some shipment of a type as to which plaintiff has received a favorable decision on the issue of liability in the instant proceeding, it would be necessary for plaintiff to submit its own documents, properly authenticated and admissible under the rules of evidence, in order to establish the amount of plaintiff's recovery on the particular shipment.

## CONCLUSION OF LAW

The court concludes as a matter of law that plaintiff is entitled to recover on its claims for diversion compensation in connection with shipments 4430 and 6940, on its claims for additional compensation in connection with the delivery of shipments 3881 and 5280 from storage-in-transit, on its claim for compensation in connection with the additional land transportation performed on shipment 8720, on its claims for storage-in-transit and warehouse handling charges in connection with shipment 1860, on its claim for additional compensation in connection with the warehouse handling performed on shipment 3240, on its claims for storage-in-transit, warehouse handling, and delivery from storage-in-transit charges in

connection with shipment 2798, on its claims for the loss of the containers used in connection with shipments 1680 and 6980, on its "normal port" claim relative to shipment 4970, and on its claim for an area surcharge in connection with shipment 3040; and judgment is entered to that effect. The amount of plaintiff's recovery will be determined in subsequent proceedings under Rule 131(c).

The court further concludes as a matter of law that plaintiff is not entitled to recover on its diversion claims relative to shipments 1100, 1240, 1520, 1820, 2500, 2520, 3160, 3920, 4277, 4800, 5080, 5660, 5820, 6260, and 6980, or on its claims for additional compensation in connection with the transportation of shipments 1160, 1320, 1560, 2400, 4240, 4960, 5080, 5280 and 5460, or on its claims for compensation in connection with the delivery of shipments 1240, 5950 and 6820 from storage-in-transit, or on its claims for compensation in connection with the additional land transportation allegedly performed on shipments 120, 1340, 3019, 3160 and 3290, or on its claim for an area surcharge in connection with shipment 3240, or on its "normal port" claim relative to shipment 2620, or on its claims for warehouse handling charges in connection with shipments 1040 and 1669, or on its waiting time claims relative to shipments 602, 2458 and 4430; and the petitions are dismissed as to all such claims.

The court further concludes as a matter of law that defendant is entitled to recover on its counterclaims relative to shipments 1520, 4568 and 5080, and judgment is entered to that effect. The amount of defendant's recovery will be determined in subsequent proceeding under Rule 131(c).

The court further concludes as a matter of law that defendant is not entitled to recover on its counterclaim relative to shipment 602 (this counterclaim having been withdrawn by defendant), and such counterclaim is dismissed.

DAVIS, Judge (dissenting in part):

I join in the court's opinion and conclusions except for that portion of Part I, "Alleged Diversion to New Point Without SIT (Storage-in-Transit)", which deals with shipment 6940 (and the corresponding part of the conclusion). The issue of delivery to a serviceman's residence outside of the particular city in which the military post happens to be located, as illustrated by shipment 6940, is indeed ticklish and Judge Durfee's opinion exposes many of the problems. But the position adopted by the court, though perhaps easy of mechanical application, seems to me too technical and too heedless of the basic concept of the door-to-door service. That fundamental premise is that "in shipments not involving SIT * * * [the carrier] is obliged in consideration for the single-factor rate to 'pick-up' goods at the origin residence and 'deliver' these goods to the destination residence. In other words, the single-factor rate necessarily includes one 'pick-up' and one 'delivery' and all the land and water transportation in between * * *." Routed Thru-Pac, Inc. v. United States, 401 F.2d 789, 793, 185 Ct.Cl. 428, 435 (1968). Where it is transporting a serviceman's goods to a new base under this system, the carrier normally expects, and is expected, to deliver those goods at the serviceman's residence without extra payment. Everyone knows that the residential areas in which a serviceman stationed at a base may live (if he resides off-post) can be in the same city or outside it, depending on the local geographic and real estate development. A soldier at Fort McNair in Washington can just as easily live in Maryland or Virginia as in the District of Columbia, and in some instances will be closer to his work if he does. This obvious probability was doubtless known to the carriers when they undertook door-to-door service for military men being transferred to new posts, and I think they anticipated deliveries to those servicemen's residences.[1]

---

1. Commissioner White expressed the same idea when he said in his opinion:

"It was part of the plaintiff's responsibility, in return for the transportation

Like the court, I find the idea of a "normal commuting distance" (which Commissioner White used) too vague and litigation-fraught. I would simply hold that, in a case like this where the consignment is to "S/Sgt. Theodore R. Moore, AF 17324220, USAF, Maxwell Air Force Base", the normal assumption would be that Sergeant Moore is to be stationed at the Base, that if he lives off-post he will designate his residence, and that he will commute from there to Maxwell—and, accordingly, that the carrier's normal obligation is to deliver to the home Sergeant Moore designates (in this case in Prattville). If the carrier suspects that the serviceman is not to be stationed at that particular Base but at another, or is retired,[2] or is really living on-post or not at home, it can put the Government to proof. Those instances, I think, will be few compared to the numbers who will go daily or frequently to the base from the designated residence.

True, the bill-of-lading gives "Montgomery, Alabama" as the formal destination, but that was, in my view, simply to show the location of Maxwell Air Force Base. The court treats this whole problem as if "Maxwell Air Force Base" was not closely and importantly connected on the bill-of-lading with Sergeant Moore; the court's result would be the same, I gather, if the consignment ran solely to "S/Sgt. Theodore R. Moore" (without any reference to Maxwell) and the destination was "Montgomery, Alabama." To me, on the other hand, it is very significant that Sergeant Moore is closely linked to Maxwell on the bill-of-lading; this indicates that he was assigned and would undertake his duty there.[3] In the words of Commissioner White: " * * * the 'destination' under the government bill of lading was really the residence address where the property owner would live upon taking up his new duty assignment at Maxwell Air Force Base. The plaintiff knew that it could not completely discharge its contract obligation until the household goods had been delivered to and placed in such residence * * *."

The alternative the court selects means that a diversion occurred because Sergeant Moore chose to live off-post in Prattville—despite the court's difficulty, I have no trouble thinking of Prattville as in the metropolitan area of Montgomery—instead of in Montgomery itself. The analogue for the Washington metropolitan area could be the military doctor at Walter Reed Hospital who decides to live in Silver Spring, Maryland, rather than in Foggy Bottom, or perhaps the naval physician at the Bethesda (Maryland) Naval Hospital who

---

charge paid by the defendant, to pack and 'containerize' the household goods at the origin residence, to transport the containers to the destination residence, and to remove the household goods from the containers and place them in the destination residence. At the time when the property owner was transferred from Japan to Maxwell Air Force Base and his household goods were tendered to and accepted by the plaintiff for transportation, it was not known by the property owner, by the defendant, or by the plaintiff just where the property owner would be residing after he began his new duty assignment at Maxwell Air Force Base. The property owner might be assigned government-owned quarters on the base, or it might be necessary for him to obtain housing in some nearby civilian area. Consequently, the plaintiff was instructed in the government bill of lading to notify the transportation officer at Maxwell Air Force Base upon the arrival of the ship-

ment at Montgomery, so that the transportation officer could give the plaintiff specific delivery instructions (or else direct the plaintiff to place the shipment temporarily in SIT until delivery instructions could be issued)."

2. If the serviceman is retired or assigned to another post, the use of "Maxwell Air Force Base" on the bill-of-lading in connection with his name would be misleading.

3. If the property owner had been listed simply as "S/Sgt. Theodore R. Moore" and the destination as "Montgomery, Alabama", I would agree with the court that a delivery in Prattville would be a diversion. In that instance there would be nothing to indicate that the serviceman would be stationed at Maxwell Air Force Base and therefore no reason to believe that he would reside anywhere other than in Montgomery proper.

resides in the District of Columbia or Chevy Chase, Maryland, instead of in Bethesda. Such results seen to me haphazard and wholly unrelated to the underlying conception of this door-to-door service (where there is no storage-in-transit). If the wording of the regulations compelled this conclusion, I would of course agree, but their generalities seem to me open to a more reasonable reading.[4]

NICHOLS, Judge, joins in the foregoing dissenting opinion by Judge Davis.

NICHOLS, Judge (dissenting in part):

I too am troubled about Part I, shipment 6940. If one wishes to be technical about, it many, perhaps most, naval, military, and air bases, forts, posts, stations, arsenals and shipyards are not within the political limits of any state, county, city or town. This is because, up to 1940, the Government had to obtain exclusive jurisdiction by state consent over all lands acquired in a state for those purposes. 40 U.S.C. § 255, R.S. § 355. By the Act of October 9, 1940, Ch. 793, 54 Stat. 1083, 40 U.S.C. § 255 was amended. Heads of agencies may now agree with states to acquire such jurisdiction as they deem desirable. Thus the Quantico Marine Base is not within Quantico, Virginia. Actually, in that particular instance the town is discrete but wholly surrounded by the base. It seems to me, therefore, because of the above reason and the further ones Judge Davis intimates, wholly arbitrary to draw a distinction as to shipments consigned to a serviceman at XYZ base, so called, as between deliveries in the nearby town of XYZ, and deliveries made in other cities or towns in the vicinity, calling the latter, but not the former, a "diversion."

The concept of "normal commuting area" is a tricky thing to read into a tariff rate. Sometimes, "commuters," from other municipalities, and even, as here in Washington, other sttaes, may dwell closer to the destination base, fort, etc., than do those in the same municipality. Yet, here in Washington, there is nothing viewed as eccentric in a person's working in a D.C. office and commuting to it daily from a residence as far away as Baltimore, Maryland, Annapolis, Maryland, or even Richmond, Virginia. Daily commutations from Cape Cod to Boston are now common, though the nearest point is 60 miles away. New Yorkers commute equal or greater distances. Los Angeles commuting distances, too, are staggering. We judges simply do not know enough how things are, all over the country, and among service people, not civilians, to know whether a "normal commuting area" could be anywhere with confidence inked in large solid black, or whether it would be the disputed penumbra that would be the largest. Courts are simply not equipped to initiate this kind of concept, despite the current views of many that courts can and should do anything.

As I read Judge Davis, he would have the carrier take its chance on the serviceman who, for any personal reason, might select a dwelling place requiring longer travel to his place of work than the normal commuter would tolerate, so long as the designated base was still his *bona fide* place of work. As a resolution of what I hope is a "dead end" case, this may be the best way. The carriers no doubt have already learned from this litigation to frame their tariffs otherwise than those here involved. A logical alternative would be to repent of our decision in *TOVS, cit. supra,* that it is no diversion to have to deliver in the municipality that bears the same name as the base, or has the same post office address, when the base is named after some departed hero. Were the matter *res integra,* but with the added light on concomitants now afforded me, I might decide that issue differently. However, *interest res publicae ut sit finis*

---

4. My view would also dispose of shipment 6260—dealt with in Part XIII of the court's opinion ("Claims on Quantum Meruit Basis")—against the plaintiff, but I do not object to the way in which the court reaches that result through another route.

*litigiae.* Judge Davis' proposal also has the advantage of better harmony with the solutions proposed in Parts XIII and XIV of the opinion. By the above round-about route, I arrive at it, and join in it.